OPINION OF THE COURT
Walter M. Schackman, J.
The sole issue to be decided in this motion to dismiss at the end of the People’s case is whether or not forcible rape and sodomy have been committed when a woman submits to these *964 acts, without physical resistance on her part, and without an explicit threat by a man with whom she is trapped in an elevator that is stalled between floors.
The defendant in the instant case was indicted on charges of rape in the first degree and sodomy in the first degree. Upon the completion of the People’s case, and again upon completion of the entire case, the defense moved for a trial order of dismissal as to both counts of the indictment, pursuant to CPL 290.10. The defense claimed that the People had failed to present sufficient evidence upon which the jury could find beyond a reasonable doubt that the defendant exercised forcible compulsion in the commission of the crimes charged, this being an essential element of each of them.
This court reserved decision on this motion and the jury ultimately returned a verdict of guilty as to both counts. The motion to dismiss must now be decided.
THE INCIDENT
On August 27, 1979, the complainant, a 49-year-old woman, who was five feet tall and who weighed 130 pounds, entered the lobby of her apartment building at about 6:00 p.m., returning home from work. When an elevator arrived, the complainant entered and pressed the button for the 10th floor, on which her apartment was located. A young male entered the elevator with her and pressed the button for another floor.
The next thing the complainant noticed was the elevator stopping. Upon looking up to see if it was her floor, she saw the defendant standing by the elevator buttons, manipulating them. She also saw that the elevator was stopped between floors, with the door to the elevator shaft being open. However, the alarm bell of the elevator did not go off.
The complainant testified that the defendant, a 15-year-old male approximately five feet seven inches tall and weighing in excess of 200 pounds, turned around and told her to take her clothes off, and undress. When the complainant did not respond the defendant repeated this demand. The complainant then complied and was subjected to acts of sexual intercourse and sodomy during the next 10 to 15 minutes.
Following this, the defendant told the complainant to get dressed, and he started the elevator back up, eventually getting out at the 22nd floor. The complainant testified that she was then able to get the elevator back down to her floor, *965 where she got out, went into her apartment, and called the development’s security police force. They then contacted the New York City Police Department. The defendant was identified by the complainant later that evening at the security police offices, and he was then arrested.
The complainant testified that she had not attempted to scream at any time before or during the incident because she felt that no one outside the elevator could have heard her, or helped her. She also testified that the defendant did not use any overt physical force against her, either before or during the incident, other than what was necessary for completion of the sexual acts. She further testified that the only express threat made by the defendant came after completion of the incident, as he was leaving the elevator, in which he stated that if anything "happened” to him in the next couple of days, his friends would "get her”.
THE LAW
Since 1965, New York’s statutes dealing with nonconsensual sex offenses that were committed by forcible compulsion, have spoken in terms of the use by the perpetrator of either a sufficient amount of physical force, or of threats. In addition, the courts were also required to judge the sufficiency of the resultant behavior and emotions of the victim. Therefore, where physical force was used by the defendant, the question was whether the resistance of the victim was sufficient to indicate lack of consent, and when the defendant resorted to the use of threats, either express or implied, the question was whether the victim sustained a sufficient degree of fear, either of death, serious physical injury or of being kidnapped.
Many jurisdictions have similar forcible rape and sodomy statutes, and many of them have had as much difficulty applying them to the changing societal standards and viewpoints as New York has had. "As might be expected, the use of the outward manifestation of the subjective state of mind of the victim has proved an unsure index to the conduct of rapists. How much resistance indicates nonconsent? Some states require resistance to the utmost, an unenlightened attitude that has been repudiated elsewhere. Where utmost resistance is not required, great confusion exists. Some cases seem to impose a reasonableness standard, while others emphasize decision by the woman without requiring that her fears be reasonable * * * Still other cases require sufficient *966 resistance to make nonconsent reasonably manifest. The amount of resistance required depends on all of the circumstances of the case.” (The Resistance Standard in Rape Legislation, 18 Stanford L Rev 680, 682-683.)
The cases in New York seemed to fluctuate on a case-by-case basis, each Judge and jury having to decide for themselves whether or not the resistance offered by the victim was sufficient. Many cases used the "reasonable resistance” standard, in which the Judge and jury decided whether or not the resistance of the woman in each case of a type which reasonably indicated, in light of all the circumstances of the incident, that she did not consent to the sexual advances of the man. This standard was based on the rationale that "obviously the degree of force required to place somebody in fear will vary with the person involved. It may take a great deal of force * * * or a great deal of threat to overcome resistance in some people. It may require far lesser degree to overcome the resistance of others.” (People v Yanik, Supreme Ct, NY County, July 7, 1975, Evans, J.)
The use in New York of the "reasonable resistance” standard seemed to come to a definitive end, however, when the Appellate Division, First Department, issued a pronouncement that "Rape is not committed unless the woman opposed the man to the utmost limit of her power * * * A feigned or passive or perfunctory resistance is not enough. It must be genuine and active and proportioned to the outrage.” (People v Yanik, 55 AD2d 164, 167.)
Many civil rights and women’s rights groups were outraged at this seeming retrenchment by the courts to the old "utmost resistance” standard. They put forth two major arguments in their fight to change this law in New York.
First, they pointed out that "[rjeports concerning violent crimes support the concept that resistance offered by the victim often causes the attacker to escalate the level of violence he is using to effectuate the crime.” (Snyder, Reform of New York’s Rape Law Proposed, NYLJ, Dec. 13, 1978, p 6, col 1.) To illustrate this point, the public was referred to the notorious New York case, People v Allweiss (61 AD2d 74), which dealt with a defendant who had earlier pleaded guilty to a series of six rapes, four of the victims of which he had threatened with a knife, and all of whom he had grabbed by the throat during the assault. This case dealt with a homicide, however, since the seventh rape victim was the first to strug *967 gle and to cry out, as a result of which she was manually strangled to death, and also stabbed viciously and repeatedly, by the defendant.
The argument that resistance by a rape victim greatly increased the likelihood of increased violence by the perpetrator, was borne out by a study authorized by the Department of Justice. This comprehensive analysis of rape incidents declared that "victims who resisted were more likely to be injured than victims who did not. This result was observed across counties of all sizes. The likelihood of receiving injuries which required hospitalization was almost doubled in those cases in which the victims resisted their attackers. These results indicated an important danger in the popular notion (and some statutory requirements) that a victim of an attack should resist to her utmost.” (Forcible Rape: A National Survey of the Response by Prosecutors, National Institute of Law Enforcement and Criminal Justice, Law Enforcement Assistance Administration, March, 1977, at p 14).
This fact has also been recognized by the New York City Police Department, and other law enforcement agencies, who "advise women who are threatened with rape to use their judgment as to how much physical resistance it is safe to offer. They recognize that submission might be the only alternative open to the victim as a means of saving her life, and that in some instances futile attempts at physical resistance may very well place the victim’s life in further jeopardy.” (An act to amend the Penal Law in relation to the definition of forcible compulsion in sex offenses: Memorandum in Support, New York State Assembly, Committee on Codes, June, 1977.) Accordingly, this information has been incorporated in "Rape Alert: Safety Measures,” a joint publication of the New York City Police Department and the organization "New York Women Against Rape,” in which women are advised, once an attacker makes known his demands, to follow their instincts. They must check out how they match up physically and psychologically with their assailant and decide if they can safely run, scream or fight. They are advised to do what they are told, since that is the safest course to follow, and that they should do what it takes to stay alive.
The second major argument put forth in favor of the proposed changes in the Penal Law of New York, was the fact that awareness of women’s rights was rapidly changing in today’s society, and it was time to discard the anachronistic *968 concept that women who are raped had probably "asked for it,” a concept which held them to be equally guilty in the eyes of many. Many women’s groups sought changes in the law in order "to focus attention exclusively on the actor’s conduct. In every other crime except a sex crime the only factor that is considered important is the behavior of the defendant. It is only in sex crimes that the victim has had to 'prove’ himself or herself, and in many cases the victim has been, effectively, put on trial along with the defendant to have his or her conduct judged.” (Snyder, Reform of New York’s Rape Law Proposed, NYLJ, Dec. 14, 1978, p 4, col 2.)
The New York State Legislature did not delay long in taking action to remedy this situation. The legislators realized that "the existing law places women in a cruel dilemma, forcing them to choose to follow either the advice of law enforcement experts not to resist where personal safety would be jeopardized, on the one hand, or [to follow] the legal resistance mandate on the other.” (An act to amend the Penal Law, in relation to the definition of "forcible compulsion” in sex offenses: Memorandum in Support, New York State Senate, June, 1977). They realized that women in New York were faced with a decision, not to resist in order to save their lives, but destroying any possibility of obtaining a rape conviction against their assailants. This was not demanded of the victim of any other crime.
Therefore, barely six months after the decision by the Appellate Division, First Department, in Yanik (55 AD2d 164, supra), the New York State Legislature passed a law amending subdivision 8 of section 130.00 of the New York Penal Law, the definition of forcible compulsion, by explicitly stating that a woman has to exert only "earnest resistance”, and that earnest resistance does not mean utmost resistance. Rather, earnest resistance means "resistance of a type reasonably to be expected from a person who genuinely refuses to participate in sexual intercourse, deviate sexual intercourse or sexual contact, under all the attendant circumstances.” (L 1977, ch 692, § 2.)
The intent behind this legislation was set forth in the preamble of the new law, in which it was decreed that: "It is the legislature’s intention to modify the resistance requirement in the definition of forcible compulsion so that the victim need only offer so much resistance as is reasonable under the circumstances.” (L 1977, ch 692, § 1.)
*969 The Legislature had clearly decided to modify "the requirement in forcible rape cases so that the amount of resistance must be proportional to the circumstances of the attack [taking into account factors], such as the relative strength of the parties, and the futility of resistance. Under [this] standard, the perpetrator of a sex crime would no longer be excused from culpability because his victim, in fear of death or serious physical injury, had ceased to resist, and had therefore survived.” (Senate Mem.)
Some States, such as Michigan (Mich Comp Laws Ann, § 750.520Í) and Ohio (Ohio Rev Code Ann, § 2907.02) have gone further and recently passed statutes relieving the prosecution of the need to show any resistance as proof of nonconsent, an enlightened viewpoint which would eliminate this problem altogether. However, New York was brought in line with the majority of other States, such as California, of whose law it was written: "The resistance must be such as might be expected from 'a’ woman in the victim’s circumstances. This plus the reasonableness required removes the victim’s opinion from the case. The concern is not with what she thought was necessary but what would reasonably appear necessary to a woman in her position. The reasonable-under-the-circumstances approach, with language to make clear that the woman need not incur serious risk of death or serious bodily injury is as low as the standard can be set and remain consistent with fair treatment of defendants.” (Stanford L Rev 680, 685.)
Therefore, in the instant case, this court must decide whether the People presented sufficient evidence from which a jury could conclude, beyond a reasonable doubt, that the defendant’s sexual acts with the complainant had been committed by the use of forcible compulsion, that is, "physical force which is capable of overcoming earnest resistance; or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person, or in fear that he or another person will immediately be kidnapped.” (Penal Law, § 130.00, subd 8.) Included in this is the definition of earnest resistance as mentioned previously.
That the complainant’s freedom was violated there is no doubt. The United States Supreme Court long ago said that "[t]he inviolability of the person is as much invaded by a compulsory stripping and exposure as by a blow. To compel *970 any one, and especially a woman, to lay bare the body, or to submit to the touch of a stranger, without lawful authority, is an indignity, an assault and a trespass” (Union Pacific Ry. Co. v Botsford, 141 US 250, 252). The issue before this court is more complex, however, since it must determine from the facts of this case whether the defendant either exerted physical force capable of overcoming this complainant’s reasonable, earnest resistance, or whether the complainant was overcome by fear of immediate death or serious physical injury due to threat from the defendant. Both of these questions must be measured by all of the attendant circumstances of this case.
Taking the latter question first, it is clear that there was no express threat issued by the defendant. It is just as clear to this court, however, that there was a definite implied threat from the defendant to the complainant, from which she could reasonably have concluded that she was faced with immediate death or serious physical injury. The defense argued that the defendant never once threatened her expressly, and that there was also no implied threat, because the defendant did not mention or display any gun, knife or other weapon. How then could the complainant have been put in fear of immediate death or serious physical injury?
The answer, in part, is that it is a well-settled point of law that a threat can be implied, as well as being express. A California court stated over 35 years ago that: "We are unable to agree with the view that there can be no threat * * * unless it is expressed in words or through the exhibition of a gun, knife or other deadly weapon. A threat may be expressed by acts and conduct as well as by words. If one were met in a lonely place by four big men and told to hold up his hands or to do anything else, he would be doing the reasonable thing if he obeyed, even if they did not say what they would do to him if he refused. Their actions and manner might well indicate their purpose and intention and it would be a mere play on words to say that these actions and circumstances did not constitute and were not the expression of, a threat. In fact, it would be a very compelling one.” (People v Flores, 62 Cal App 2d 700, 703.)
Here, instead of being faced with four big men in a lonely place, the complainant was faced with a husky teen-ager, who was seven inches taller and who outweighed her by over 70 pounds. She was trapped in a stalled elevator, between floors, with no place to retreat to, or from which help could arrive. *971 The law, and common sense, did not require that she ascertain what the defendant would do to her if she refused to take off her clothes. Nor does it take but a brief recognition of the everyday events in this city to reasonably conclude that a gun, knife or other deadly weapon might quickly and savagely be used if she did not yield to the defendant.
Therefore, this court finds, as a matter of law, that the People presented sufficient trial evidence from which the jury could conclude, beyond a reasonable doubt, that the defendant engaged in sexual acts with the complainant by means of forcible compulsion, in that there was an implied threat which placed the complainant in fear of immediate death or serious physical injury.
Although this alone would be enough to deny the defendant’s motion, the "physical force” aspect of this case would lead this court to the same conclusion. While the defendant did not actually grab or hit the complainant, his act of manipulating the elevator to stop it between floors was certainly a physical act directed against the complainant. That act, plus the physical advantages that the defendant enjoyed, constituted the use of physical force which is capable of overcoming earnest resistance.
There are many instances where no resistance could reasonably be expected from a person who genuinely refuses to participate in sexual activities, and it is difficult for this court to imagine one clearer than the case at hand. The fact that the defendant would have inevitably succeeded in forcing himself on the complainant, able to overcome any possible resistance she could have offered, plus the fact that she was totally at his mercy in the stalled elevator, clearly indicates to this court, under all the attendant circumstances, that total compliance by the complainant was all that earnest resistance could reasonably require. In a similar situation, the New York Court of Appeals declared that "at the time she capitulated she was virtually imprisoned and isolated in the elevator” (People v Coleman, 42 NY2d 500, 506). In that case, the complainant was sexually attacked in an elevator by two men, who had jammed open the elevator doors (on a regular floor stop) with a shopping cart. As a matter of fact, toward the end of the incident the complainant was able to push away the cart and run out of the elevator and down the corridor. The fact that this could not have happened in the instant case illustrates the true level of hopelessness this victim faced.
*972 Therefore, this court finds, as a matter of law, that the People presented sufficient trial evidence from which the jury could conclude, beyond a reasonable doubt, that the defendant engaged in sexual acts with the complainant by means of forcible compulsion, in that he used physical force capable of overcoming the earnest resistance of the complainant.
Having decided that the trial evidence presented by the People in the instant case was legally sufficient to establish the offenses charged in the indictment, it was for the jury to decide the question of the guilt or innocence of the defendant. "Unlike most other human activities rape is an encounter the nature and dynamics of which can be perceived by the average person, including a juror” (People v Yanik, 43 NY2d 97, 100). As mentioned previously, the jury returned a guilty verdict on both counts of the indictment, and this court finds no grounds to set aside that verdict.
Wherefore the defendant’s motion to dismiss the indictment, on the ground that the trial evidence was not legally sufficient to establish the offenses charged therein, is denied.