[No. 53603-1. En Banc. November 5, 1987.]

THE STATE OF WASHINGTON, *Petitioner,* v. MICHAEL EARL BLACK, *Respondent.*

---

*Donald C. Brockett, Prosecuting Attorney,* and *Salvatore F. Cozza, Deputy,* for petitioner.

*Allen & Hansen, P.S., David Allen,* and *Richard Hansen,* for respondent.

CALLOW, J.—QUAERE: May the State, in a rape case, offer expert testimony on "rape trauma syndrome" to prove that the alleged victim did not consent to sex with the alleged assailant?

The trial court held such evidence admissible, and the defendant was convicted of third degree rape. The Court of Appeals reversed. We hold that expert testimony on rape trauma syndrome is inadmissible because it lacks scientific reliability and unfairly prejudices a defendant accused of rape. We affirm the Court of Appeals and remand for a new trial.

The conviction arose from an incident in August 1984 involving the defendant and R.J., a close family friend and neighbor. R.J. was 16 at the time of the incident. Both parties essentially related the same version of events leading up to sexual intercourse. R.J. testified that the defendant offered to hug and touch her for $100, she attempted to leave, but he then locked the door and forced her to have both oral sex and sexual intercourse, after which he permitted her to leave and pleaded with her not to turn him in. The defendant admitted that he made the alleged $100 offer, but said he did so jokingly in response to her statement that "I don't do anything for free." The defendant also admitted that the two did later engage in both oral sex and sexual intercourse, but he asserts that the encounter was entirely consensual and that no force was involved.

At the trial, R.J.'s mother and friends testified as to their observations of R.J. after the incident. They stated that she was emotionally distraught and had had nightmares of the incident for several days thereafter. This testimony was admitted over the objection that it was hearsay, its admission was deemed proper by the Court of Appeals, and its propriety has not been challenged in the present appeal.

The testimony at issue here was given by Kelleen Bermensolo, a counselor for the Lutheran Social Services Rape Crisis Network in Spokane. Bermensolo testified that she had a master's degree in social work and 4 years' experience working with 150 to 200 victims of rape and sexual assault. She stated that she had counseled R.J. on a weekly basis for several months "after the rape."

The prosecutor asked Bermensolo whether R.J. was "suffering emotional trauma" and Bermensolo replied "[y]es".

Defense counsel then objected to this testimony "based on the foundation laid." The court sustained the objection, following which the prosecutor further questioned Bermensolo about her experience in dealing with rape victims. She stated:

> In every rape victim that I have seen they exhibit consistent symptoms . . . For example, body soreness, guilt, shame, feelings about the trial, nightmares, flashbacks, these are common symptoms that rape victims experience. *There is a specific profile for rape victims and [R. J.] fits in.*

(Italics ours.) In response to defense counsel's questions as to whether trauma can come from sources other than rape, Bermensolo later explained that she relied on "what the symptoms show according to the rape trauma syndrome." She also stated that this syndrome was developed by Ann Burgess and Lynda Holmstrom. *See* Burgess & Holmstrom, *Rape Trauma Syndrome,* 131 Am. J. Psychiatry 981 (1974).

Defense counsel then again questioned Bermensolo: "[T]he bottom line that I am asking, it is possible . . . [that] symptoms that are manifested by rape crisis victims could also be manifested for some other reason than rape; isn't that true?" Bermensolo replied: "My training is in the area of sexual assault and when the symptoms are apparent that fit the sexual assault with the rape trauma syndrome, I can't say . . . what a reaction would be in another area."

The trial court admitted Bermensolo's testimony over the objection of defense counsel. The court found the defendant not guilty of second degree (forcible) rape but guilty of third degree (nonconsensual) rape. The trial court considered Bermensolo's testimony in reaching its decision.

The Court of Appeals reversed, holding that an inadequate foundation had been laid for the introduction of testimony on rape trauma syndrome. The State appealed. We accepted review.

Two issues are presented:

> First, did the defendant at trial properly raise his objection to the admissibility of expert testimony on rape

trauma syndrome, to preserve this question for appeal?

Second, should such testimony be deemed inadmissible because (1) "rape trauma syndrome" is a theory which has not gained general acceptance within the scientific community, and (2) such testimony constitutes an opinion as to the guilt of the defendant, thereby invading the exclusive province of the finder of fact?

## I

The State argues that at trial defense counsel did not specifically object to the scientific reliability or acceptance of "rape trauma syndrome", and is thereby precluded from raising this issue on appeal. We disagree.

ER 103(a)(1) provides:

Error may not be predicated upon a ruling which admits . . . evidence unless . . .

(1) . . . a timely objection or motion to strike is made, stating the specific ground of objection, *if the specific ground was not apparent from the context . . .*

(Italics ours.) Defense counsel at trial objected to Bermensolo's qualifications to testify on rape trauma syndrome, "based on the foundation laid." Although counsel did not specifically raise a challenge to the reliability of rape trauma syndrome as a means of proving rape, this ground for objection is readily apparent from the circumstances. On voir dire, defense counsel repeatedly asked whether trauma or emotional distress can come from sources other than rape or sexual assault. When Bermensolo specifically stated that she was relying on rape trauma syndrome, he again inquired whether this syndrome was unique to rape. Defense counsel's questions were more than adequate to apprise the trial court of his objection to the use of rape trauma syndrome as a fact–finding method in a rape case.

The State alternatively argues that any possible error concerning testimony on rape trauma syndrome was self–invited by defense counsel and is therefore not subject to appellate review. *See State v. Kaiser,* 34 Wn. App. 559, 565, 663 P.2d 839, *review denied,* 100 Wn.2d 1004 (1983).

The State relies on the fact that Bermensolo used the term "rape trauma syndrome" only in response to defense counsel's questions. We deem this circumstance immaterial when viewed in light of the entire course of questioning.

The prosecutor originally asked Bermensolo if, in her opinion, R.J. was suffering from "emotional trauma". When defense counsel objected to this testimony, the prosecutor questioned her further. Bermensolo responded by describing symptoms commonly found in rape victims and added, "[t]here is a specific profile for rape victims and [R.J.] fits in." Such testimony, elicited from the prosecutor, was tantamount to an assertion that R.J. suffered from "rape trauma syndrome", even though Bermensolo did not use that precise term until later in the proceedings. Defense counsel did not invite any possible error precluding judicial review.

## II

The defendant contends that the trial court erred in admitting into evidence, and relying upon, expert testimony on "rape trauma syndrome". We agree.

The admissibility of expert testimony is governed by ER 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under this rule, (1) the witness must be qualified as an expert; (2) the opinion must be based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony must be helpful to the trier of fact. *State v. Allery,* 101 Wn.2d 591, 596, 682 P.2d 312 (1984). Kelleen Bermensolo's qualifications as an expert have not been challenged on appeal. Thus, we address only the second and third prongs of this 3–prong test.

## A
### SCIENTIFIC RELIABILITY OF "RAPE TRAUMA SYNDROME" AS A MEANS OF PROVING RAPE

In Washington, expert testimony based on new scientific theories is admissible only if it meets the standard enunciated in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). Under this standard, the scientific principle from which deductions are made must be sufficiently established to have gained general acceptance in the scientific community. *State v. Canaday*, 90 Wn.2d 808, 812, 585 P.2d 1185 (1978) (citing *Frye*). This standard has frequently been applied to determine the admissibility of scientific evidence. *See Allery* ("battered woman syndrome" evidence admissible); *State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984) (hypnosis evidence inadmissible); *State v. Woo*, 84 Wn.2d 472, 473–75, 527 P.2d 271 (1974) (polygraph evidence inadmissible in the absence of stipulation by both parties); *State v. Maule*, 35 Wn. App. 287, 295–96, 667 P.2d 96 (1983) (court disallowed expert testimony regarding characteristics of sexually abused children when no scientific basis for such testimony was cited); *State v. Steward*, 34 Wn. App. 221, 223–24, 660 P.2d 278 (1983) (court disallowed expert testimony regarding alleged propensity of babysitting boyfriends to inflict child abuse); *State v. Mulder*, 29 Wn. App. 513, 514–15, 629 P.2d 462 (1981) ("battered child syndrome" evidence admissible).

Here, the question is whether rape trauma syndrome has been generally established as a scientifically reliable means of proving that a rape occurred. As this is a question of first impression in this State, we turn to both the literature on the subject and the opinions of other jurisdictions for guidance.

### 1. Scientific Treatises

The term "rape trauma syndrome" was first coined by Ann Burgess and Lynda Holmstrom in the 1974 article, previously noted, describing symptoms commonly experienced by victims of rape. Burgess & Holmstrom, *Rape*

*Trauma Syndrome,* 131 Am. J. Psychiatry 981 (1974). The authors state at page 982:

Rape trauma syndrome is the acute phase and long–term reorganization process that occurs as a result of forcible rape or attempted forcible rape. This syndrome of behavioral, somatic, and psychological reactions is an acute stress reaction to a life–threatening situation.

Studies conducted by both Burgess and Holmstrom and other authors assert that victims of rape may display any of a wide–ranging variety of symptoms. In the acute phase (immediately after the rape) any or all of the following may be observed: physical trauma, tension headaches, sleep pattern disturbances, gastrointestinal irritability, humiliation, embarrassment, anger, revenge, and self–blame. In the "long–term reorganization process", victims may display a number of additional symptoms, including: nightmares, changing one's residence, changing one's phone number, fear of indoors, fear of outdoors, fear of being alone, fear of crowds, fear of men, and sexual fears. Burgess & Holmstrom, at 982–84; *see also* L. Ledray, *Recovering From Rape* 70–90 (1986); H. Benedict, *Recovery* 21–40 (1985); C. Dean & M. deBruyn–Kops, *The Crime and the Consequences of Rape* 105–08, 110–13 (1982); J. Williams & K. Holmes, *The Second Assault: Rape and Public Attitudes* 81–87 (1981); C. Warner, *Rape and Sexual Assault* 145–49 (1980); Bassuk, *A Crisis Theory Perspective on Rape,* in *The Rape Crisis Intervention Handbook* 124–26 (S. McCombie ed. 1980); S. Katz & M. Mazur, *Understanding the Rape Victim: A Synthesis of Research Findings* 215–31 (1979).

One overriding theme permeates the literature on this subject: namely, that there is no "typical" response to rape. *See, e.g.,* Ledray, at 71 ("There is really no such thing as a 'normal' response to rape"); T. McCahill, L. Meyer, & A. Fischman, *The Aftermath of Rape* 75 (1979) ("Clearly, the concept of a typical rape victim has no place within the context of postrape adjustment"). One commentator explains,

[e]ach rape victim responds to and integrates the experience differently depending on her age, life situation, the circumstances of the rape, her specific personality style, and the responses of those from whom she seeks support.

Notman & Nadelson, *The Rape Victim: Psychodynamic Considerations*, 133 Am. J. Psychiatry 408, 409 (1976). Thus, the symptoms displayed by victims occur in various combinations and sequences. Moreover, Burgess & Holmstrom concede that victims of rape may display one of two directly conflicting emotional manifestations which are referred to as "styles". Some women display an "expressed style" (outwardly emotional) while others display a "controlled style" (calm, composed and subdued). Among the latter group, some display no visible symptoms at all. Burgess & Holmstrom, at 982–83.

Because the symptoms associated with "rape trauma syndrome" embrace such a broad spectrum of human behavior, the syndrome provides a highly questionable means of identifying victims of rape. Indeed, the American Psychiatric Association indicates that the stress and trauma associated with rape is merely one type of a larger phenomenon known as "post–traumatic stress disorder". Similar symptoms may be triggered by any psychologically traumatic event that is "generally outside the range of usual human experience", including simple bereavement, chronic illness, marital conflict, assault, military combat, natural disasters, automobile accidents, bombing, or torture. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 236–38 (3d ed. 1980); *see also* Horowitz, Wilner, Kaltreider & Alvarez, *Signs and Symptoms of Posttraumatic Stress Disorder,* 37 Archives of Gen. Psychiatry 85 (1980). Even those symptoms more especially applicable to sexual experiences may not be caused by rape. Authorities indicate that they may be caused by any "sexually stressful experience". *See* Notman & Nadelson, at 408; Note, *Checking the Allure of Increased Conviction Rates: The Admissibility of Expert Testimony on Rape Trauma Syndrome in Criminal Proceedings,* 70

Va. L. Rev. 1657, 1696 (1984).

Several authors have also criticized the methodology of the studies which have been conducted to determine symptoms of rape victims. Among the shortcomings cited are the following: (1) differences in definitions and criteria for "rape"; (2) unrepresentative, biased, or inadequate sampling of victims; (3) inadequate means of eliciting information about victims; (4) lack of long–term assessments of victims; and (5) lack of a control group (*i.e.,* a group of nonraped women) against which to compare the symptoms observed in rape victims. Ruch & Leon, *Type of Sexual Assault Trauma: A Multidimensional Analysis of a Short–Term Panel,* 8 Victimology 237, 238–39 (1983); Kilpatrick, Resick & Veronen, *Effects of a Rape Experience: A Longitudinal Study,* 37 J. Soc. Issues 105, 108–09 (1981); Kilpatrick, Veronen & Resick, *The Aftermath of Rape: Recent Empirical Findings,* 49 Am. J. of Orthopsychiatry 658, 658–59 (1979); S. Katz & M. Mazur, at 3–27; Note, 70 Va. L. Rev. at 1667–80. One commentator succinctly describes the inherent difficulties in conducting reliable studies:

It is difficult to design a scientific study investigating the impact of sexual assault on survivors. A controlled study would require obtaining data from a large sample of women, following these women over time, and later reassessing the sample to determine the incidence and impact of sexual assault. However, such a study is not feasible.

J. Becker, L. Skinner & G. Abel, *Sequelae of Sexual Assault: The Survivor's Perspective,* in *The Sexual Aggressor: Current Perspectives on Treatment* 263 (1983). Largely because of these methodological shortcomings, "available studies are inconsistent as to the length of recovery time and the variables affecting the dynamics of rape victimization." Ruch & Leon, at 239.

These findings cast grave doubt on the reliability of employing "rape trauma syndrome" to prove that an alleged victim was, in fact, raped. Three noted authorities have concluded:

An obvious first step in addressing the needs of rape victims is to obtain accurate information regarding the aftermath of rape.

Unfortunately . . . this first step has been more of a stumbling lurch than a measured advance. To date, investigations of how a rape experience affects women over time have been scarce and methodologically poor. . . . Therefore, these studies provide little, if any, scientifically valid data regarding the effects of a rape experience, although they do provide interesting anecdotal impressions.

Kilpatrick, Veronen & Resick, at 658–59.

### 2. Judicial Opinions and Observations

The admissibility of expert testimony on rape trauma syndrome has been considered in a number of other jurisdictions. The courts are sharply divided on the issue. Some have held such testimony inadmissible to prove that the alleged victim did not consent to intercourse and was, therefore, raped. *State v. Saldana,* 324 N.W.2d 227 (Minn. 1982); *State v. Taylor,* 663 S.W.2d 235 (Mo. 1984); *People v. Bledsoe,* 36 Cal. 3d 236, 681 P.2d 291, 203 Cal. Rptr. 450 (1984). Others have held such testimony admissible for this purpose. *State v. Marks,* 647 P.2d 1292 (Kan. 1982); *State v. Liddell,* __ Mont. __, 685 P.2d 918 (1984); *State v. Huey,* 145 Ariz. 59, 699 P.2d 1290 (1985); *State v. Allewalt,* 308 Md. 89, 517 A.2d 741 (1986) (5–to–2 opinion held testimony on "post–traumatic stress disorder" admissible in rape case to prove lack of consent).

■ We find the opinions which exclude the testimony persuasive. The courts which have admitted rape trauma syndrome testimony believe it sufficient that the myriad of symptoms encompassed therein are "generally accepted to be a common reaction to sexual assault." *Marks,* at 1299; *Huey,* at 63; *Allewalt,* at 107. We find, however, that this is not the relevant question. The issue is *not* whether rape victims may display certain symptoms; the issue is whether the presence of various symptoms, denominated together as "rape trauma syndrome", is a scientifically reliable method admissible in evidence and probative of the issue of

whether an alleged victim was raped. *See Allewalt,* at 115 (Eldridge, J., dissenting). The literature on the subject demonstrates that it is not.

In *Bledsoe,* at 250, the California Supreme Court emphasized that rape trauma syndrome was not intended to be a forensic, fact–finding device. Rather, it is an "'umbrella' concept, reflecting the broad range of emotional trauma experienced by clients of rape counselors." The court cogently points out how rape trauma syndrome differs significantly from other seemingly similar methods of proof:

> There is, however, a fundamental difference between rape trauma syndrome and both the battered child syndrome and the other scientific methods of proof that have in the past been evaluated against the *Frye* standard of reliability. Unlike fingerprints, blood tests, lie detector tests, voiceprints or the battered child syndrome, rape trauma syndrome was not devised to determine the "truth" or "accuracy" of a particular past event—i.e., whether, in fact, a rape in the legal sense occurred—but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients or patients. As the professional literature makes clear—and as the expert testimony in this case also reveals—because in the past women who have brought charges of rape have traditionally had their credibility or motives questioned by the police and others, rape counselors are taught to make a conscious effort to avoid judging the credibility of their clients. As one expert in the field recently wrote: "when a woman seeks services from a psychologist, she wants and deserves help for her problems, not judgment. *Judgment is appropriate for courtrooms, not for psychologists' offices. . . .*"
>
> Thus, as a rule, rape counselors do not probe inconsistencies in their clients' descriptions of the facts of the incident, nor do they conduct independent investigations to determine whether other evidence corroborates or contradicts their clients' renditions. Because their function is to help their clients deal with the trauma they are experiencing, the historical accuracy of the clients' descriptions of the details of the traumatizing events is not vital in their task.

(Footnotes and citation omitted.) *Bledsoe,* at 249–50.

Likewise, *Saldana* and *Taylor* also rejected expert testimony on rape trauma syndrome. *Saldana* explicitly found that this syndrome is not the type of scientific test that reliably determines whether a rape has occurred, as the characteristic symptoms may follow any psychologically traumatic event. *Saldana,* at 229. *Taylor* similarly concluded that at best, the syndrome might identify persons who had been subjected to a traumatic experience—perhaps even a stressful sexual experience. But to suggest that the syndrome reliably indicates rape "is indeed a chasm too wide and deep to leap." *Taylor,* at 241.

We agree, and hold that under the *Frye* standard, expert testimony on rape trauma syndrome is not a scientifically reliable means of proving lack of consent in a rape case.

### B
### Prejudicial Nature of Expert Testimony on "Rape Trauma Syndrome"

Expert testimony is not admissible unless it will be helpful to the trier of fact. *State v. Allery,* 101 Wn.2d 591, 596, 682 P.2d 312 (1984). Included in this equation is the question of whether the prejudicial nature of the testimony is so great as to render such testimony inadmissible. *See State v. Mulder,* 29 Wn. App. 513, 516, 629 P.2d 462 (1981); *State v. Steward,* 34 Wn. App. 221, 224, 660 P.2d 278 (1983). The defendant contends that expert testimony on rape trauma syndrome is unfairly prejudicial because it constitutes an opinion as to the guilt of the defendant, thereby invading the exclusive province of the finder of fact. We agree.

No witness, lay or expert, may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference. *State v. Garrison,* 71 Wn.2d 312, 315, 427 P.2d 1012 (1967); *State v. Haga,* 8 Wn. App. 481, 492, 507 P.2d 159, *review denied,* 82 Wn.2d 1006 (1973). Here, rape counselor Bermensolo testified that, in her opinion, R.J. suffered from rape trauma syndrome, and that "[t]here is a specific profile for rape victims and R.J. fits in." In *Sal-*

*dana,* at 230, the Minnesota Supreme Court aptly observed that:

> [p]ermitting a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the complainant was therefore raped, unfairly prejudices the [defendant] by creating an aura of special reliability and trustworthiness.

*Accord, Bledsoe,* at 251. The danger of prejudice is especially acute where, as here, the expert expressly uses the term "rape trauma syndrome." As one court cogently notes, "[t]he term itself connotes rape." *Taylor,* at 241. It carries with it an implied opinion that the alleged victim is telling the truth and was, in fact, raped. *Taylor; see Bledsoe,* at 251 n.14. It constitutes, in essence, a statement that the defendant is guilty of the crime of rape.

We add, however, that we do not share the view, espoused by some courts, that an expert witness' decision to avoid the term "rape trauma syndrome" thereby renders such testimony admissible. In *State v. Allewalt,* 308 Md. 89, 517 A.2d 741 (1986), for example, the court allowed an expert witness to testify that the alleged victim suffered from a form of "post–traumatic stress disorder" with rape as the likely stressor. The court suggested that the same testimony would be inadmissible had it been labeled as testimony on "rape trauma syndrome". *Allewalt,* at 98, 108. We find such semantic distinctions unpersuasive. In the present case, the testimony of rape counselor Bermensolo, whether it be denominated as a form of "post–traumatic stress disorder", "rape trauma syndrome" or otherwise, was unfairly prejudicial and hence inadmissible.

We do not imply, of course, that evidence of emotional or psychological trauma suffered by a complainant after an alleged rape is inadmissible in a rape prosecution. The State is free to offer lay testimony on these matters, and the jury is free to evaluate it as it would any other evidence. We simply hold that the State may not introduce expert testimony which purports to scientifically prove that an alleged rape victim is suffering from rape trauma syndrome.

We adopt the views summarized by the following observations in *Saldana*:

> The scientific evaluation of rape trauma syndrome has not reached a level of reliability that surpasses the quality of common sense evaluation present in jury deliberations. . . . To allow such testimony would inevitably lead to a battle of experts that would invade the jury's province of fact–finding and add confusion rather than clarity.

*Saldana*, at 230.

The decision of the Court of Appeals vacating the conviction of the defendant is affirmed and the cause is remanded for a new trial.

DOLLIVER, DORE, ANDERSEN, GOODLOE, and DURHAM, JJ., concur.

UTTER, J. (concurring in the result)—This is an unusual case. The State failed to lay the most rudimentary foundation for the evidence it sought to introduce in this case. In addition, its expert does not appear to be qualified to testify upon the subject matter proffered. Because the State failed to meet the requirements of ER 703, I concur in the result reached by the majority.

I write separately, however, to express my disagreement with the way the majority has apparently closed the door to the admission of expert testimony in an area of great sensitivity, even in cases where the requirements of ER 703 are met. It has done so needlessly in a case of first impression that arrived before this court with a wholly inadequate foundation. The majority unnecessarily and prematurely forecloses potentially meritorious cases where the trier of fact could benefit greatly from the testimony of experts.

The majority asserts that the State may admit lay testimony as evidence of emotional or psychological trauma after an alleged rape, and "the jury is free to evaluate it as it would any other evidence." Majority, at 349. There are, however, many circumstances in which a judge or jury may need assistance in understanding the evidence put before

them, where the subject matter is strange, emotional, and overladen with historical assumptions and possibly misapprehensions.

> A jury punishes, excuses, exonerates, ignores, or selects from a hodgepodge of social and psychological information received in the courtroom. . . . The theory of our system is that jurors can separate out the facts which legally determine guilt in a particular incident. The reality may be that human beings cannot suppress or sort out the social and psychological information which is received and processed constantly during a criminal trial. Rape cases are a particularly fruitful area of interdisciplinary study because attitudes toward sexual behavior are blatantly personal, social, idiosyncratic, and emotional. Most members of the public probably do not have strong opinions about whether or not the government should pay damages to a railway trainman injured on the tracks. Most members of the public have very definite opinions as to whether or not a particular circumstance involving sexual intercourse should be classified as criminal.

H. Feild & L. Bienen, *Jurors and Rape* 7 (1980).

The main criticism offered by the majority of rape trauma syndrome is that it is not a scientifically reliable means of *proving rape.* I agree with this general proposition. The State should prove each case it brings against a subject on its own merits by proving each element of the crime charged. Where the issue at bar is simply whether the offense occurred, the prosecution should not be permitted to bring in an expert to describe a "typical" crime victim, tell the fact finder that the complaining witness is such a person, and conclude that the defendant is guilty. In fairly straightforward cases such as the instant one, the finder of fact is able to perform its traditional function unaided by expert opinion.

We should reserve judgment, however, in those problematical cases where the circumstances are more involved, and the defendant has opened the door to such a line of inquiry by bringing the mental state or behavior of the alleged victim into question to show that a rape could not have

occurred. In such an instance, the State should be permitted to rebut the defense's theory of the case to show the fact finder that it is possible that a rape occurred. Such use of expert testimony does not invade the province of the finder of fact. Rather, it gives the determination of the ultimate fact at issue back to the judge or jury.

ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The majority's survey of the scientific literature reveals that the theory proffered may well be valuable and admissible under ER 702.

> One overriding theme permeates the literature on this subject: namely, that there is no "typical" response to rape. . . . Moreover, Burgess & Holmstrom concede that victims of rape may display one of two directly conflicting emotional manifestations which are referred to as "styles". Some women display an "expressed style" (outwardly emotional) while others display a "controlled style" (calm, composed and subdued). Among the latter group, some display no visible symptoms at all.

Majority, at 343–44.

This court could, in the future, be presented with a case where the State alleges a woman was the victim of a particularly brutal rape, possibly with multiple attackers. If she responds in the "controlled style," the defense could seize upon her apparently incongruous lack of hysteria to allege that no attack occurred, or that the woman consented. The intuitive response of the average juror may well be to assume that a woman could not possibly respond calmly to such an assault. In such a case, the evidence presented to the jury by both parties concerning the victim's mental state and behavior is counterintuitive, and may appeal to the unconscious assumptions and prejudices of the average juror—or judge. Under circumstances such as these, an

expert witness who, in the language of ER 702, "qualifie[s] as an expert by knowledge, skill, experience, training, or education," could provide the useful information to the trier of fact that, contrary to what may be expected, a rape victim may very well suppress her (or his) emotions in order to cope with the assault.

In incest rape cases, the defense frequently chooses to attack the credibility of the alleged victim where the complainant is the only witness. Under such circumstances, it is not unusual for the trier of fact to be presented with evidence of an extremely unstable family unit. A child has accused his or her parent of rape, and the parent accuses the child of making false and malicious accusations of a particularly abhorrent nature. In the face of such distasteful, contradictory, emotional, and perturbing testimony, a judge or juror who did not have personal knowledge or some type of exposure to such familial patterns may well not know how to understand the actions and reactions of the parties. *See generally* Comment, *Statutes of Limitations in Civil Incest Suits: Preserving the Victim's Remedy,* 7 Harv. Women's L.J. 189 (1984).

The Supreme Court of Oregon, faced with such a case, concluded that the trial court acted properly in admitting expert testimony from two social workers (a juvenile counselor and a child protective social worker) on the emotional reactions of child incest victims. In *State v. Middleton,* 294 Or. 427, 657 P.2d 1215 (1983), the trial court admitted testimony on some of the common emotional reactions in incest rape victims. The State's experts testified that a young incest victim tends to internalize guilt and frequently recants his or her accusations. The Oregon Supreme Court held that the testimony was useful to the trier of fact.

If a complaining witness in a burglary trial, after making the initial report, denied several times before testifying at trial that the crime had happened, the jury would have good reason to doubt seriously her credibility at any time. However, in this instance we are concerned with a

child who states she has been the victim of sexual abuse by a member of her family. The experts testified that in this situation the young victim often feels guilty about testifying against someone she loves and wonders if she is doing the right thing in so testifying. It would be useful to the jury to know that not just this victim but many child victims are ambivalent about the forcefulness with which they want to pursue the complaint, and it is not uncommon for them to deny the act ever happened. . . .

*State v. Middleton, supra* at 435–36. The court concluded that the jury would be aided by an explanation of this "superficially bizarre behavior." The Supreme Court of Hawaii came to the same conclusion on similar facts in *State v. Kim,* 64 Hawaii 598, 645 P.2d 1330 (1982).

Obstacles to rape prosecutions in the form of challenges to the complaining witnesses' credibility have permeated the legal system for years. Juries have a general tendency to view rape charges with skepticism and suspicion, especially when there is a suggestion of willingness or agreement on the part of the victim. H. Kalven & H. Zeisel, *The American Jury* 249–57 (1966). *See also Commonwealth v. Bailey,* 370 Mass. 388, 394, 348 N.E.2d 746, 750 (1976). Convictions, in the absence of aggravating circumstances, are the exception rather than the rule. L. Holmstrom & A. Burgess, *The Victim of Rape: Institutional Reactions* 238 (1973). Rape victims have been subjected to reluctance on the part of the police to prosecute, harsh treatment in hospitals, and social stigma. Prejudice against rape victims has been manifested in the judicial system in the form of special evidentiary requirements that are not imposed in other criminal prosecutions, including other forms of assault.

One example is the requirement that a complaining witness' report of rape be corroborated by some independent source.[1] The reasons for the corroboration requirement are at once contradictory and legion. "An examination of these rationales reveals a tangled web of legitimate concerns, out–

---

[1] This requirement has been eliminated by statute in the state of Washington. RCW 9A.44.020(1).

dated beliefs, and deep–seated prejudices." *United States v. Wiley*, 492 F.2d 547, 552 (D.C. Cir. 1973) (Bazelon, C.J., concurring). Proponents of a corroboration requirement argue that unfounded rape charges are common, either because women are malicious or ashamed, or they fantasize rape. In 1680, Lord Chief Justice Hale wrote, in a passage often repeated in pattern jury instructions, that rape is "an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho never so innocent." 1 M. Hale, *Pleas of the Crown* 634 (1st Am. ed. Philadelphia 1847) (1680).

Women were also required to "resist to the utmost"[2] a rape assault in order for a prosecution to go forward, because to a "good" woman, rape was a "fate worse than death." Conversely, a seductive woman who invited her attack may well decide that she enjoyed the assault and cried rape falsely later to protect her reputation. (*See, e.g., State v. Rusk*, 289 Md. 230, 247, 424 A.2d 720 (1981) (Cole, J., dissenting), arguing that prosecutrix willingly engaged in intercourse although defendant choked her, reasoning that because she had air enough to plead with defendant the choking was not serious enough to find a rape.) In most jurisdictions, the chastity of a rape complainant was considered probative on the woman's general character, and hence, upon her credibility. A woman's propensity for falsehood was presumed to increase in proportion to her sexual experience. Note, *Rape, Racism, and the Law,* 6 Harv. Women's L.J. 103, 126 (1983).

There is no evidence showing that sex crime charges are frequently falsified or that sexual victims are an inherently unreliable class whose testimony should not be believed in the absence of corroboration. *See* Note, *The Rape Corroboration Requirement: Repeal Not Reform,* 81 Yale L.J. 1365

---

[2]Evidence indicates that resistance offered by victims to violent crimes "often causes the attacker to escalate the level of violence he is using to effectuate the crime.'" *People v. Dorsey*, 104 Misc. 2d 963, 966, 429 N.Y.S.2d 828 (1980), citing Snyder, *Reform of New York's Rape Law Proposed*, New York L.J., Dec. 13, 1978, at 6, col. 1.

(1972). On the contrary, evidence indicates that it is more difficult to convict for rape than for other major crimes. *See People v. Rincon–Pineda,* 14 Cal. 3d 864, 538 P.2d 247, 123 Cal. Rptr. 119 (1975). Nor has it been shown that false charges of rape are brought more commonly than charges of other crimes. In fact, there are many countervailing reasons not to report a rape.

> A victim may fear being accused of provocation, active participation, or irresponsibility, or she may fear retaliation by the offender. She may experience shame or a desire to protect her reputation. She may also fear the reactions of her husband or parents. . . .

(Footnote omitted.) Comment, *Rape and Rape Laws: Sexism in Society and Law,* 61 Cal. L. Rev. 919, 921–22 (1973). Humiliating defense attacks on rape victims' reputations led to the widespread passage of "rape shield" laws in the late 1970's.

Repudiation of the discredited corroboration requirement is not, even today, unanimous among the jurisdictions. Nebraska still retains the corroboration requirement. Other jurisdictions have only recently rejected the special corroboration requirement for rape victims, either legislatively or by judicial decision—Florida, 1979; Delaware, 1974; Connecticut, 1974; Alabama, 1976; Indiana, 1976; Michigan, 1975; Minnesota, 1975; District of Columbia, 1985. Other states have eliminated the absolute corroboration requirement only in a qualified and begrudging manner—Mississippi, New Hampshire, New York, and Illinois. *People v. Kilgore,* 39 Ill. App. 3d 1000, 350 N.E.2d 810 (1976) (retaining requirement of prompt complaint to corroborate).

Changes in social attitudes and legislation since the early 1970's have occurred which have affected the judicial treatment of rape victims.

> These reforms, though they have not taken place in the majority of states, represent an important step toward the recognition that rape is a violent, assaultive crime against women which bears no relationship to consensual

sexual activity. Until society internalizes that reality, women will continue to be . . . degraded and humiliated by our social and judicial institutions which carry the message to the victim that whatever happened to her, it was her fault.

H. Feild & L. Bienen, *Jurors and Rape* 187 (1980).

I agree with the conclusion of the majority. The facts presented in this case and the failure of the State to lay an adequate foundation for its offered evidence compel the result reached. I do not believe that we should keep from juries and judges in all cases the potential benefit of a field of study accepted in many other jurisdictions.[3] This type of testimony, properly qualified, may help triers of fact to understand the mental state and behavior of the rape victim with muted demeanor and behavior, or an incest victim who recants, or other rape victims who do not conform to our legal system's shameful legacy of "out–dated beliefs, and deep–seated prejudices."

BRACHTENBACH, J., and CUNNINGHAM, J. Pro Tem., concur with UTTER, J.

---

[3]*See generally* Annot., *Admissibility, at Criminal Prosecution, of Expert Testimony on Rape Trauma Syndrome,* 42 A.L.R.4th 879 (1985).