**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON,

               Respondent,

       v.

ELIJAH WEBSTER,

               Appellant.

No. 87337-7-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — Elijah Webster appeals his convictions for assault in the first degree while armed with a firearm, and unlawful discharge of a firearm. He makes several arguments, including that he was deprived of the right to a fair jury trial because a detective offered testimony that was an improper opinion on his guilt. We affirm.

I

On the evening of May 30, 2024, Olympia police officers were dispatched to a firearm disturbance at the Fern Ridge Apartments (Fern Ridge) involving multiple people, including a male wearing a flannel shirt and armed with a firearm.

There were multiple reports of gunshots being fired near Fern Ridge's building Q. The responding officers did not initially hear or see anything when they arrived. A

perimeter was established near the back of the apartment complex, and the responding officers began advancing by vehicle and on foot.

Evidence of an exchange of gunfire was found: several bullet casings in the driveway south of building Q, bullet holes in a vehicle, and broken glass. There were also casings and bullet holes found in building P, located just north of building Q. The physical evidence found was consistent with at least two different shooters.

A male wearing a flannel shirt and walking near building Q toward the general direction of building R, matched the initial description of the person that dispatch had indicated was armed with a firearm. After providing his ID card to law enforcement, he was identified as Bekweri Bost and let go. After learning that he may have been involved in the shooting, police officers negotiated with Bost to leave his apartment, and he was taken into custody. A search warrant for Bost's apartment was executed, and a firearm was found behind a water heater inside a closet.

At trial, Bost testified that on the day of the altercation he had picked up his kids from daycare and came home when he was accosted by two or three individuals. Bost took his children home, grabbed his .40 caliber pistol, and came back outside because he felt there "was going to be an incident."

Once back outside, Bost got into a heated argument with one of the individuals from the group. Bost felt as though the group started to surround him, so he pulled out his firearm, aimed it down, and said "[g]et the F back." Bost testified that as the argument continued, he realized the severity of the situation and tried to defuse it by saying, "Well, okay. Maybe I'm tripping." Bost then started walking away toward the

main road and his apartment. Before reaching his apartment, Bost stopped by his truck to see if he had dropped his keys.

Bost testified that as he stood by his truck, he heard gunshots and saw a flash of color out of the corner of his eye. Bost returned fire and, after the shooting stopped, he heard a vehicle rev and drive out of the apartment complex.

Rhonda Hicks, a resident at Fern Ridge, testified that on the day of the incident she heard arguing in the back parking lot. She looked outside the window of her living room and saw two people talking, one of which she referred to as "Isaiah," who she later identified in open court as the defendant, Webster. At that point, Hicks stopped watching and called 911.

Another resident at Fern Ridge, Phoenix Holmes, testified that on the day of the incident she heard "[v]ery loud voices" outside of her window and saw two individuals "[y]elling with high aggression." She said that she recognized one of the individuals, who was dressed in blue, and identified him in open court as Webster. Although Holmes stated that both individuals had firearms, she specified that, within one minute of looking outside her window, Webster pulled out a gun from his waistband and pointed it at the other individual, dressed in a red flannel shirt. A minute after that, the individual in red also pulled out a gun and pointed it at Webster. Holmes then testified that both of them started moving toward the front of the building and "started shooting automatically." Holmes indicated that she changed positions in her apartment to continue watching, and clarified that "it was the blue-shirted individual that fired first[,]" and that she "saw it going off. That's why I said very clearly, it was the blue-shirted

[individual] that had fired first." Holmes then saw the male in red run in the direction of building R while Webster ran to a vehicle, got inside, revved the engine, and fled.

On May 30-31, 2024, Detective Jacob Theis interviewed several witnesses, including Hicks and Holmes.

On June 2, 2024, Webster was arrested. That same day, Theis interviewed Webster. A video of the interview, exhibit 245, was admitted into evidence without objection.[1] Initially, Webster said a friend told him about the shooting at Fern Ridge and that Webster himself was not there. Ex. 245, at 14 min., 20 sec. to 20 min., 0 sec. But after being told that law enforcement had placed a tracker on his vehicle, Ex. 245, at 39 min., 0 sec. to 39 min., 17 sec., and that Washington follows the doctrine of self-defense, Ex. 245, at 42 min., 37 sec. to 42 min., 59 sec., Webster provided his version of the events the day of the altercation. Ex. 245, at 48 min., 51 sec. to 54 min., 0 sec. Notably, Webster told Theis that Bost fired at him first and he returned fire. Ex. 245, at 53 min., 47 sec. to 53 min., 57 sec.

Webster was charged with assault in the first degree while armed with a firearm and unlawful discharge of a firearm. A jury found him guilty as charged. The trial court imposed a standard range sentence of 93 months followed by a 60-month firearm enhancement for a total sentence of 153 months on the assault in the first degree, and 364 days to run concurrent on the unlawful discharge of a firearm.

Webster appeals.

---

[1] Exhibit 245 is a video recording of Theis's interview of Webster.

II

Webster argues that his constitutional right to a fair jury trial was violated when Theis offered testimony that was an improper opinion on his guilt.

A

Under both the United States and Washington Constitutions, criminal defendants have the right to a speedy and public trial "by an impartial jury." U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.

"The general rule is that no witness, lay or expert, may 'testify to his opinion as to the guilt of the defendant, whether by direct statement or inference.'" City of Seattle v. Heatley, 70 Wn. App. 573, 577, 854 P.2d 658 (1993) (quoting State v. Black, 109 Wn.2d 336, 348, 745 P.2d 12 (1987)). Such testimony invades the province of the fact finder and is unduly prejudicial. Heatley, 70 Wn. App. at 577. But "testimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony." Heatley, 70 Wn. App. at 578.

In deciding whether particular statements constitute impermissible opinion testimony, courts consider five factors: (1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact. State v. Demery, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001).

B

At trial, after Theis's recorded interview of Webster was played for the jury, the following exchange between the prosecutor and Theis took place without objection:

[Prosecutor:] At one point in that conversation, you indicated to Mr. Webster that you believed that he may have been victimized. Did you have any evidence to support that in this case at the time of that conversation?

[Theis:] No, I didn't. I have to stress that my investigation was ongoing and active at that time.

[Prosecutor:] And then why did you make that statement to Mr. Webster?

[Theis:] Often, when we're interviewing people, especially sometimes when people are more closed off or we're interviewing them about something that's a little bit more shocking to the—to the population, right, something like a shooting, people tend to be more closed off. And so I sometimes will offer something like that as a—as an avenue, as a door, as a way to connect with somebody, and then later understanding that that's something that they may say or something that they may adopt, then obviously [it] would be my job to disprove or prove that. So, ultimately, it's a way to connect with somebody and get conversation flowing.

[Prosecutor:] And you also mentioned self-defense to Mr. Webster. What was the purpose of bringing that topic up?

[Theis:] Oftentimes when somebody—when I sense that somebody is guarded about something that we're talking about, I may offer multiple theories that would explain why this was okay, in a way minimizing the actions that occurred to make it easier to then move into a conversation where more information comes out.

As you can see in this interview, that was kind of the catalyst to the shift in tone and the shift in information flow in this conversation. It is also a valid defense in the State of Washington.

[Prosecutor:] At that time, did you have any evidence to support assault— do you believe there was evidence to support a self-defense claim?

[Theis:] No.

Based on that exchange, Webster argues that his constitutional right to an impartial trial was violated because Theis was allowed to opine that there was no evidence to support his claim of self-defense. Webster relies on State v. Read, 100 Wn.

App. 776, 998 P.2d 897 (2000), adhered to on remand, 106 Wn. App. 138, 22 P.3d 300 (2001). But his reliance is misplaced.

In Read, the defendant raised a self-defense claim and argued that some of the testimony from his bench trial constituted improper opinion on his guilt.[2] 100 Wn. App. at 778, 781-82. The defendant asserted that one of the witnesses, a pathologist and coroner, opined about the validity of his defenses "by testifying [that] he was 'sighting right down the gun when it went off.'" Read, 100 Wn. App. at 781-82. The court disagreed, explaining that the testimony was not a direct or indirect "improper expression of [the defendant's] guilt[,]" given that the fact finder "still had to decide (1) whether to believe [the] testimony, and (2) the ultimate issue whether he shot [the victim] by accident or in self-defense." Read, 100 Wn. App. at 782.

Nonetheless, the Read court determined that "several other questions appear[ed] to have crossed the line. These questions went beyond mere perceptions of the witnesses and addressed the very heart of [the defendant]'s self-defense claim." Read, 100 Wn. App. at 787. Specifically, the prosecutor asked the witnesses (1) "if there was 'any reason for [the defendant] at that point to defend himself'"; (2) "if [the defendant] '[h]ad to pull out a weapon at that time'"; (3) "if [the defendant] '[h]ad to shoot [the victim]'"; (4) "if 'anybody ma[d]e [the defendant] defend himself'"; (5) "if there was any reason why [the victim] 'needed to be shot'"; and (6) "if there was any reason why [the victim] was shot or for [the defendant] to defend himself." Read, 100 Wn. App. at 787 (some alterations in original). These questions, the Read court explained, "solicited

_____

[2] The defendant in Read appealed his convictions for second degree murder, first degree assault, and unlawful possession of a firearm. 100 Wn. App. at 778.

opinions that, at least by inference, went directly to the validity of [the defendant]'s defense, and thus his guilt." 100 Wn. App. at 787.

Here, unlike in Read, neither the prosecutor's questions, nor Theis's answers, addressed Theis's state of mind, or the validity of a potential self-defense claim by Webster, let alone his guilt. Instead, both the prosecutor's and Theis's phrasing show that the testimony was a statement of fact meant to clarify that Theis's questions about self-defense were not rooted in evidence or an opinion about validity that he had formed at the time he was interviewing Webster. Rather, Theis's questions were part of a strategy "to connect with [Webster] and get conversation flowing." See, e.g., State v. Notaro, 161 Wn. App. 654, 669, 255 P.3d 774 (2011) (explaining that a detective's "full trial testimony about his tactical interrogation statements adequately informed the jury that he was not expressing his personal belief of [the defendant's] veracity"). In addition, Theis prefaced his testimony by stating, "I have to stress that my investigation was ongoing and active at that time." Similarly, the prosecutor prefaced both of his questions about self-defense such that it was clear that he was specifically asking Theis about the timeframe of the interview: "Did you have any evidence to support that in this case at the time of that conversation?" "At that time, did you have any evidence to support assault—do you believe there was evidence to support a self-defense claim?"

Theis's testimony was also admissible under the "context of the interrogation" exception. The Washington Supreme Court has held that "an officer may repeat statements made during interrogation . . . if such testimony provides context for the interrogation." In re Pers. Restraint of Lui, 188 Wn.2d 525, 555, 397 P.3d 90 (2017). Here, Theis's testimony did not concern his state of mind, it specifically addressed the

timeframe of the interview and, as a whole, provided context about Theis's interview tactic to get Webster to open up about what happened the day of the altercation.

Webster also argues that the prosecutor's change of verb tense from past to present shows that he was eliciting an opinion about Webster's guilt from Theis. But the record shows otherwise. Webster's focuses on the phrase "[D]o you <u>believe</u> there was evidence to support a self-defense claim?" in the prosecutor's colloquy with Theis. But Webster omits the beginning of the inquiry. The prosecutor's complete query was, "<u>At that time</u>, did you have any evidence to support assault—do you believe there <u>was</u> evidence to support a self-defense claim?" First, as explained above, the prosecutor prefaced his question by limiting Theis's answer to the timeframe of the interview. Second, Webster ignores the prosecutor's use of the verb "was" in the same phrase, which further substantiates his intent to elicit a statement of fact about the amount of evidence at Theis's disposal at the time of the interview and provide a better context of Theis's interrogation tactic to get Webster to talk. This is consistent with Theis's testimony that his "investigation was ongoing and active at that time."[3]

For those reasons, we conclude that Theis's testimony was not improper opinion of Webster's guilt.

---

[3] Contrary to Webster's assertion that testimony by police witnesses "possesses an aura of reliability that makes their opinions especially damaging to the accused's right to a fair jury trial," Washington's approach is more nuanced. In <u>Demery</u>, a plurality of the court explained that an officer's trial testimony about statements made during a taped pretrial interview are not the kind of statements that carry a special aura of reliability; rather, such testimony is admissible to provide context of the interrogation. 144 Wn.2d at 763, 765. Applying that principle here, Theis's testimony about the circumstances of his questioning of Webster did not carry a special aura of reliability and provided context about his interview tactic.

We affirm.[4]

_Mann, J._

WE CONCUR:

_Feldman, J._          _Coburn, J._

---

[4] Webster also argues that (1) the prosecutor committed misconduct by eliciting Theis's testimony about the interview and (2) his defense counsel was ineffective for failing object to Theis's testimony. But because we conclude that Theis's testimony was not an improper opinion on Webster's guilt, the prosecutor's conduct cannot be characterized as improper, nor can Webster's defense counsel's conduct be considered deficient.