# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON | No. 49719-1-II |
| Respondent, | |
| v. | |
| HUGO RUIZ | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Hugo Ruiz appeals his jury trial convictions for three counts of first degree child molestation involving separate incidents with his former step-daughters, R.C-Z and P.C-Z.[1] Ruiz argues that his trial attorney provided ineffective assistance of counsel by failing to object to the State's pretrial motion to join the two cases involving R.C-Z and P.C-Z and then failing to move to sever the charges during trial. Ruiz also argues that the trial court erred in allowing the expert testimony of child forensic interviewer Keri Arnold in the areas of delayed disclosure, child memory, and recantation. We affirm.

## FACTS

### A.    THE ABUSE

Hugo Ruiz and Bricia Sanchez married in 2004. At the time, Sanchez had two daughters from a prior relationship, R.C-Z and P.C-Z

---

[1] Pursuant to our General Order 2011-1, we use initials for child witnesses in sex crimes.

1.      Incidents Involving R.C-Z

In 2011, then 10 year old R.C-Z told her school friends that Ruiz had touched her "private area" on several occasions. 5 Verbatim Report of Proceedings (VRP) (Oct. 5, 2016) at 426. Specifically, when she was in third grade, Ruiz regularly asked R.C-Z to help him get items from their garage. Outside of the garage, Ruiz lifted R.C-Z into the air, positioned his body to touch the back of her body, and moved his "private part" in a thrusting motion. 5 VRP (Oct. 5, 2016) at 431. R.C-Z described Ruiz's movements as "dry humping" her. 5 VRP (Oct. 5, 2016) at 430. R.C-Z estimated that Ruiz did this more than five times.

On another occasion, Ruiz entered R.C-Z's bedroom as she slept, spread her legs apart, and positioned himself in between her legs. With Ruiz's "private area" touching her "private area" through clothing, Ruiz moved his body in a thrusting motion. 5 VRP (Oct. 5, 2016) at 435.

R.C-Z's friends reported her disclosure to their school counselor, who then reported the allegations to Child Protective Services. Ruiz was subsequently charged with three counts of first degree child molestation. R.C-Z later denied that Ruiz had ever touched her, and the State dismissed the charges.

2.      Incidents Involving P.C-Z

Ruiz and Sanchez separated in December 2014. In February 2015, 13 year old P.C-Z told her mother's new boyfriend, Jose Sanchez Figueroa, that Ruiz had molested her when she was 7 or 8 years old. According to P.C-Z, Ruiz often touched her when she was alone in the car with him. Ruiz would place P.C-Z on his lap and move his body around as she sat on him. P.C-Z also recalled lying in bed one morning when Ruiz came into her bedroom, climbed on top of her, and

began moving his body up and down toward her head and feet. P.C-Z heard Ruiz breathing heavily in her ear as he rubbed his body on her body.

Figueroa contacted law enforcement. The State charged Ruiz with four counts of first degree child molestation involving P.C-Z. The State also refiled the 2011 charges against Ruiz involving R.C-Z.

B.     MOTION TO JOIN THE CASES

The State moved to join the cases involving P.C-Z and R.C-Z pursuant to CrR 4.3.[2] Ruiz agreed to join the cases. At the hearing on the State's motion, Ruiz's counsel stated, "Yes, Mr. Ruiz has agreed to join the cases. It makes sense, and the evidence probably would have come in under 404(b) regardless." 1 VRP (Feb. 12, 2016) at 3.

The trial court joined the cases involving P.C-Z and R.C-Z  The State subsequently filed an amended complaint, charging Ruiz with six counts of first degree child molestation—three involving P.C-Z and three involving R.C-Z

C.     RELEVANT PORTIONS OF TRIAL

1.     Lay Witness Testimony

R.C-Z and P.C-Z testified to the facts set out above. R.C-Z also explained that she took back her allegations against Ruiz in 2011 because Ruiz had told R.C-Z. that it was up to her to keep their family together. On cross-examination, Ruiz asked R.C-Z whether she was "pretty close

---

[2] CrR 4.3(a) allows two or more offenses to be joined in one charging document when the offenses "(1) [a]re of the same or similar character, even if not part of a single scheme or plan; or (2) [a]re based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan."

with [her] sister, [P.C.-Z].” 5 VRP (Oct. 5, 2016) at 452. He also questioned R.C-Z on whether she loved P.C-Z and supported P.C-Z.

During P.C.-Z’s testimony, Ruiz cross-examined her on how her uncle had previously sexually assaulted her. Ruiz further asked P.C-Z whether she had spoken with R.C-Z about R.C-Z’s experience with Ruiz before reporting that Ruiz had molested her. Ruiz then questioned P.C-Z about her dislike of Ruiz as a stepfather and about whether she liked her mother’s new boyfriend more than she liked Ruiz. P.C-Z testified that she “would get really mad” when Ruiz and her mother reconciled and that she and her sister “didn’t want anything to do with them being back together.” 5 VRP (Oct. 5, 2016) at 522.

Ruiz also testified and denied touching either girl for his own sexual gratification. Ruiz claimed that he had never been alone with R.C-Z during the time he was married to Sanchez.

2.      Expert Witness Testimony

Pretrial, Ruiz objected to Keri Arnold, a child interviewer in the Pierce County Prosecuting Attorney’s Office, being called as an expert witness, arguing that Arnold did not qualify as an expert witness. The trial court ruled that Arnold qualified as an expert through her training and experience to discuss in general the concept of script and episodic memory, how children verbalize or communicate in interviews, and the reasons for and commonality of delayed disclosure. The court also ruled that Ruiz could object at trial if he felt that Arnold was testifying outside of her expertise.

At trial, Arnold testified that she interviewed R.C-Z. in 2011, after the disclosure, and again in 2015. In her time at the prosecutor's office, Arnold had conducted more than 2,200 forensic interviews, most of which involved allegations of sexual abuse. To become a child forensic interviewer, Arnold attended the Washington State child interviewer training, where she observed other forensic interviewers. She also conducted mock interviews, reviewed research and training materials related to child abuse and child development as it relates to memory, suggestibility, and recantation. She also attended the weeklong training of the American Professional Society for the Abuse of Children on interviewing protocol and various conferences and trainings on sex offenders, child fatality investigations, and child sexual abuse and exploitation. The practices she employs when interviewing children are generally accepted within the child forensic interview community.

Arnold also testified about the concepts of delayed disclosure, script memory, and recantation. She explained that delayed disclosure refers to a lapse in time from when the alleged abuse occurred and when the child disclosed the abuse. According to Arnold, approximately 95 percent of cases she works on involve some sort of delay between the time when the abuse allegedly began and when the child reported the abuse.

Arnold explained that a child's memory develops over time and their ability to recall specific events improves over time. For example, when a child is young, he or she may only be able to provide simple elements and details of an event, but their ability to recall in more detail develops as they get older.

5

Arnold detailed the difference between script and episodic memory, explaining that script memory refers to something that occurs with a great deal of frequency. Signs a child is relaying script memory include use of language "I usually," "most of the time," or "almost always" when describing an event. Comparatively, episodic memory refers to a child's ability to recall specific details of one incident.

Finally, Arnold explained that recantation occurs when a child makes a disclosure and then later says that his or her disclosure was not true. According to Arnold, recantation is commonly discussed in trainings related to child sexual abuse because one factor that might play a role in recantation is when the offender is someone close to the child, such as a family member. A child may recant because he or she fears upsetting the non-offending parent or the allegation has disrupted the family. Arnold further explained that recantation is so common that the trainings and conferences she attends frequently discuss factors to look for and questions to ask when a child recants.

3.      Motion to Dismiss

Prior to resting its case-in-chief, the State amended the complaint, dismissing one of the counts involving R.C-Z and two of the counts involving P.C-Z  The State explained that based on the testimony, there were three specific acts of molestation that could proceed forward—the incident involving Ruiz lifting R.C-Z outside the garage; the incident where Ruiz climbed on top of R.C-Z in her bed; and the incident where Ruiz climbed on top of P.C-Z in her bed.

4.      Closing Argument

In closing, Ruiz argued that the details of P.C-Z and R.C-Z's disclosures had changed over the course of the case.  After explaining how the girls' disclosures had changed, defense counsel argued, "I did find it interesting that they both say that [Ruiz] came in under cover of night and perpetrated these crimes . . . . And it is completely askew from what it was that they initially reported.  It's brand new, and . . . the stories are very similar: Dry humping, cover of night."  8 VRP (Oct. 12, 2016) at 891, 892.  Later, defense counsel argued that P.C-Z and R.C-Z's stories had continued to evolve "[a]nd . . . [P.C-Z] and [R.C-Z] have discussed, okay, what's been going on[.]  They've talked about this."  8 VRP (Oct. 12, 2016) at 898.

Counsel also suggested that the motivation for P.C-Z and R.C-Z to fabricate the allegations was their preference for their mother's new boyfriend and their desire to prevent their mother from reconciling with Ruiz.  Defense counsel drew the jury's attention to the similarities between the testimony of P.C-Z and R.C-Z and told the jury that they had discussed the allegations with one another.

The trial court instructed the jury:

>       A separate crime is charged in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on any other count.

Clerk's Papers (CP) at 122.  The jury found Ruiz guilty on all three counts.  Ruiz appeals.

ANALYSIS

A.      INEFFECTIVE ASSISTANCE OF COUNSEL

Ruiz argues that his trial counsel rendered ineffective assistance by failing to object to the joining of his offenses involving P.C-Z with his offenses involving R.C-Z.  He also argues that his

counsel rendered ineffective assistance by failing to move for a severance in light of how the testimony of P.C-Z and R.C-Z unfolded. We disagree.

1.      Legal Principles

The right to effective assistance of counsel is guaranteed by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011), *cert. denied*, 135 S. Ct. 153 (2014). To prevail in an ineffective assistance of counsel claim, the defendant must show that (1) defense counsel's performance was deficient, and (2) the deficient performance resulted in prejudice. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Grier*, 171 Wn.2d at 33. Counsel's performance is not deficient if it can be characterized as legitimate trial strategy or tactics. *Id.* To prevail in an ineffective assistance of counsel claim, the defendant must overcome "a strong presumption that counsel's performance was reasonable." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

In order to establish prejudice, the defendant must show that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). Thus, the defendant must show that the objection would likely have been successful. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

We review a claim of ineffective assistance of counsel de novo. *Estes* 188 Wn.2d at 457. And "[c]omptency of counsel is determined based upon the entire record below." *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

2. Failure to Object to Join the Cases

a. Counsel did not render deficient performance

Ruiz argues that there was "no fathomable reason" for his trial counsel to strategically agree to join cases involving two victims alleging multiple counts of sexual conduct by him. Br. of Appellant at 35. We disagree.

Ruiz's trial strategy largely involved attacking P.C-Z and R.C-Z's credibility. In closing, defense counsel drew the jury's attention to ways in which the girls' disclosures changed over the course of the case. After detailing how both girls' disclosures had changed, defense counsel argued that their new allegations were very similar. Defense counsel also argued, "I did find it interesting that they both say that [Ruiz] came in under cover of night and perpetrated these crimes." 8 VRP (Oct. 12, 2016) at 891. Defense counsel further argued, "And it is completely askew from what it was that they initially reported. It's brand new, and . . . the stories are very similar: Dry humping, cover of night." 8 VRP (Oct. 12, 2016) at 892. Defense counsel referenced how both girls waited until three weeks before trial to disclose the allegations of "dry humping." 8 VRP (Oct. 12, 2016) at 890. Later, counsel argued that the girls' stories had continued to evolve "[a]nd . . . [P.C-Z] and [R.C-Z] have discussed, okay, what's been going on[.] They've talked about this." 8 VRP (Oct. 12, 2016) at 898. Counsel also argued that P.C-Z and R.C-Z's motivation to allege such abuse was their preference for their mother's new boyfriend and their desire to prevent her from reconciling with Ruiz.

Thus, the record shows that part of defense counsel's trial strategy was to suggest that P.C-Z and R.C-Z conspired to fabricate the allegations in order to ensure that their mother would not reconcile with Ruiz. Defense counsel supported this theory by drawing the jury's attention to the similarities between P.C-Z and R.C-Z's testimony and arguing that they had discussed the case with one another. Defense counsel was able make such arguments because the cases were joined.

Ruiz's counsel also may have believed that trying the cases together would allow the weaker case to undermine the stronger case. And trying the cases together allowed the jury to hear evidence that the girls' uncle had been convicted for sexually assaulting P.C-Z, which may not have been inadmissible in a separate trial involving R.C-Z. Therefore, defense counsel's agreement to join the cases can be characterized as legitimate trial strategy or tactic.

b.      Ruiz fails to show prejudice

Ruiz fails to show that the trial court would have denied the State's motion if defense counsel had objected to the joinder. Thus, Ruiz fails to show prejudice.

If the State originally charges a defendant of multiple counts in separate charging documents, the court may join the offenses on a party's motion. CrR 4.3(a); *State v. Bluford*, 188 Wn.2d 298, 306, 393 P.3d 1219 (2017). Offenses are eligible for joinder if they " '[a]re of the same or similar character, even if not part of a single scheme or plan.' " *Id.* (quoting CrR 4.3(a)).

Here, the counts involving P.C-Z and R.C-Z were of similar character, as they were all allegations of first degree child molestation involving Ruiz's former stepdaughters. And while our Supreme Court has noted that prior sexual offenses have an inherently prejudicial effect, the court has also held joinder to be proper when a defendant is accused of multiple child sex crimes involving different victims. *See Bluford*, 188 Wn.2d at 315; *State v. Markle*, 118 Wn.2d 424, 439,

10

823 P.2d 1101 (1992) (affirming joinder of two counts of statutory rape and one count indecent liberties involving defendant's two nieces).

In determining whether joinder would result in prejudice, the court must consider four factors:

> (1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.

*Bluford*, 188 Wn.2d at 311-12 (quoting *State v. Russell*, 125 Wn.2d 24, 63, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995)). Ruiz acknowledges that the record is insufficient for us to determine if the trial court would have found joinder to be prejudicial if defense counsel had objected.

Ruiz "bears the burden of showing, based on the record developed in the trial court, that the result of the proceeding would have been different but for counsel's deficient representation." *McFarland*, 127 Wn.2d at 337. Without a sufficient record for us to determine whether the trial court would have found joinder to result in prejudice, Ruiz is unable to show that but for his counsel's failure to object, the trial court would have denied the State's motion to join the cases.

Because Ruiz fails to show that his counsel's performance was deficient and fails to show resulting prejudice, his ineffective assistance counsel claim fails.

2.      Failure to Move for a Severance During Trial

Ruiz also argues that his trial counsel was ineffective for failing to move to sever the cases during trial in light of P.C-Z and R.C-Z's trial testimony.[3]  Again, we disagree.[4]

When multiple offenses have been properly joined, a party may bring a motion to sever the charges and divide the joined offenses into separate charging documents under CrR 4.4(b). *Bluford*, 188 Wn.2d at 306.  Upon motion, the trial court "shall grant a severance of offenses whenever before trial or during trial with consent of the defendant, the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b).  As in joinder, in assessing whether the potential for prejudice requires severance, the court must consider:

> (1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.

*Russell*, 125 Wn.2d at 63.

---

[3] We note that Ruiz's arguments on severance undercuts his challenge that defense counsel was ineffective for failing to object to joinder.  Ruiz argues, "[b]ecause the extent of prejudice resulting from joinder of offenses may not be apparent until trial unfolds, CrR 4.4 provides that a motion to sever may be made during trial."  Br. of Appellant at 42-43.  Thus, Ruiz's own argument suggests that it is legitimate trial strategy for counsel to agree to joinder pretrial and then determine whether to move to sever the cases in light of the actual evidence that unfolds at trial.  Ruiz's argument here also undermines his argument that his counsel's failure to object to joinder resulted in prejudice because he argues that his counsel still could have moved to sever the cases at any point until the close of evidence at trial.

[4] The State appears to argue that Ruiz waived this issue because he never moved for severance. However, Ruiz's challenge here is based on ineffective assistance of counsel, which is a claim of " 'manifest error affecting a constitutional right' " reviewable for the first time on appeal. *McFarland*, 127 Wn.2d at 333 (quoting RAP 2.5(a)(3)).

a.    Counsel was not deficient

Ruiz argues that there was no legitimate tactical reason for defense counsel to fail to move to sever the cases because such motion "would *only* have been to Mr.'s Ruiz's benefit." Br. of Appellant at 43. However, as explained above, part of Ruiz's theory of the case was that his stepdaughters had fabricated the allegations against him to prevent their mother from reconciling with Ruiz. By allowing the jury to hear the testimony of both girls in the same trial, Ruiz was able to point to the similarities in their allegations and argue that the similarities showed that they had conspired to fabricate the allegations to ensure that their mother would not reconcile with Ruiz. Therefore, the record shows a legitimate tactical reason for defense counsel to not move to sever the cases in light of how P.C-Z and R.C-Z's testimony developed.

b.    Ruiz fails to show prejudice

Ruiz also fails to show that had defense counsel moved to sever the cases during trial, the trial court would have granted the motion after considering the four factors articulated in *Russell*. Therefore, Ruiz fails to show prejudice.

Ruiz argues that the State's evidence on the charges involving P.C-Z was significantly weaker than its charges involving R.C-Z because the State sua sponte dismissed two of the counts involving P.C-Z during trial. However, the State also sua sponte dismissed one of the charges involving R.C-Z. And the State's evidence on the remaining counts was solely based upon the testimony of P.C-Z and R.C-Z. Therefore, under the first *Russell* factor, the strength of the State's evidence as to each of the remaining charges was of similar strength.

Ruiz's defense was a general denial to all the charges. And the trial court instructed the jury that:

A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

CP at 122. Thus, there is no potential for prejudice requiring severance under the second and third *Russell* factors.

As to the fourth *Russell* factor, Ruiz argues that the testimony of R.C-Z and P.C-Z would not have been cross-admissible because the allegations lacked the "high-level of similarity" to constitute evidence of a common scheme or plan under ER 404(b). Br. of Appellant at 39. However, "[t]he mere fact that evidence is not cross admissible does not automatically preclude joinder." *Bluford*, 188 Wn.2d at 315. Thus, Ruiz fails to show that had defense counsel moved to sever the cases during trial, the trial court would have granted the motion after considering the *Russell* factors.

Ruiz also fails to present any argument showing that had the trial court severed the cases, his trial outcome would have differed. He, therefore, fails to show that but for defense counsel's failure to bring such a motion, the outcome of the proceeding would have differed.

B.     EXPERT TESTIMONY OF KERI ARNOLD

Ruiz argues that the trial court abused its discretion in allowing Arnold to testify as an expert on the concepts of delayed disclosure, child memory, and recantation. He argues that Arnold was not qualified as an expert to testify on these topics, that her testimony was not helpful, and that her testimony amounted to profiling evidence.[5] We disagree.

---

[5] The State argues that Ruiz waived his objection to Arnold's testimony under ER 702 because the trial court only issued a tentative ruling and he never sought a final ruling on the State's motion to admit Arnold's expert testimony. But the record shows that the trial court did make a final ruling as to whether Arnold was qualified to testify as an expert witness at trial.

1.     Legal Principles

We review a trial court's decision to admit or exclude expert testimony for abuse of discretion. *State v. Phillips*, 123 Wn. App. 761,765, 98 P.3d 838 (2004), *review denied*, 154 Wn.2d 1014 (2005). "A trial court abuses its discretion if it relies on unsupported facts, applies the wrong legal standard, or adopts a position no reasonable person would take." *In re Detention of McGary*, 175 Wn. App. 328, 337, 306 P.3d 1005, *review denied*, 178 Wn.2d 1020 (2013). We will not disturb the trial court's ruling if the basis for admitting the expert testimony is fairly debatable. *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 352, 333 P.3d 388 (2014).

2.     The Trial Court did not Abuse its Discretion

ER 702 governs the admissibility of expert testimony at trial and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Thus, under ER 702, expert testimony is generally admissible if (1) the expert is qualified; (2) the expert relies on generally accepted theories in the scientific community; and (3) the testimony would be helpful to the trier of fact. *Johnston-Forbes*, 181 Wn.2d at 352. "Education and practical experience may qualify a witness as an expert." *State v. Jones*, 71 Wn. App. 798, 814, 863 P.2d 85 (1993), *review denied*, 124 Wn.2d 1018 (1994).

a.     Arnold was qualified under ER 702

Ruiz contends that Arnold was not qualified as an expert to testify about child memory and recantation because her experience was solely based on her experience as a child forensic interviewer and the trainings she had attended. However, a witness may qualify as an expert

"based on training, experience, professional observations, and acquired knowledge." *Jones*, 71 Wn. App. at 815.

Here, Arnold testified that she had conducted more than 2,200 forensic interviews of children, most which involved sexual abuse allegations. Her training to become a child forensic interviewer involved observing forensic interviews, conducting mock interviews, researching training materials related to child abuse and development as it relates to memory and recantation. Arnold also attended numerous conferences and trainings related to child fatality investigations and child sexual abuse and exploitation. Thus, based on Arnold's training, experience, professional observations, and knowledge, she was qualified to testify about child memory and recantation.[6]

> b.      Arnold's testimony was helpful to the jury

Expert testimony is admissible only if it is helpful to the trier of fact. *State v. Morales*, 196 Wn. App. 106, 122, 383 P.3d 539 (2016), *review denied*, 187 Wn.2d 1015 (2017). "Expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average

---

[6] Ruiz also argues that under *Black* and *Jones*, Arnold's testimony regarding the "imprinting of childhood memories" was scientific and, therefore, needed to be based upon an explanatory theory generally accepted in the scientific community. Br. of Appellant at 47. However, neither of these cases involved expert testimony related to a child's memory formation. *State v. Black*, 109 Wn.2d 336, 342, 745 P.2d 12 (1987); *Jones*, 71 Wn. App. at 813-14. In *Black*, our Supreme Court held that expert testimony on "rape trauma syndrome" had not been generally established as a scientifically reliable means of proving lack of consent in a rape case. 109 Wn.2d at 348. Meanwhile, the *Jones* court addressed expert testimony that the child victim's propensity to act out and experience nightmares were common behaviors of sexually abused children. 71 Wn. App. at 813-14. Therefore, these cases do not support Ruiz's contention that Arnold's testimony related to childhood memory was scientific.

layperson and is not misleading." *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183, *review denied*, 173 Wn.2d 1026 (2011).

Ruiz argues that Arnold's testimony regarding delayed disclosure and recantation was not helpful to the jury. Specifically, Ruiz contends that Arnold's testimony was not based upon specialized knowledge, provided only a general definition of delayed disclosure and recantation, and merely "conveyed basic notions well within the purview of the average juror." Br. of Appellant at 49.

However, in addition to providing a general definition of delayed disclosure, Arnold also testified that it was extremely common for children to delay in reporting abuse. She further testified that approximately 95 percent of cases she had worked on involved some sort of reporting delay. She also identified common factors that may impact a child's delay in disclosing abuse, such as the victim's relationship to the perpetrator and the child's lifestyle.

Similarly, after providing a general definition of recantation, Arnold explained that recantation is not uncommon in child sexual abuse cases because the offender is often someone close to the child, such as a family member. Arnold also explained that a child may recant out of fear of upsetting the non-offending parent or because the allegations have disrupted the family.

Thus, contrary to Ruiz's assertion, Arnold did not merely testify to the general definitions of delayed disclosure and recantation. She also testified as to the commonality of delayed disclosure and recantation in child sexual abuse cases and provided reasons based on her training and experience as to why a child may delay in reporting abuse or recant after making an allegation.

Frequency of and reasons for delayed disclosure and recantation is not within the common knowledge of the average layperson. And our Supreme Court has already held expert testimony

regarding delayed disclosure to be admissible when limited to an opinion that delay in reporting abuse is not unusual. *State v. Petrich*, 101 Wn.2d 566, 575-76, 683 P.2d 173 (1984), *overruled on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

Further, when a witness's credibility is put in issue, the trial court may in its discretion, allow an expert witness to provide evidence tending to corroborate the testimony. *Id.* at 575. Here, Ruiz extensively cross-examined R.C-Z on her recanting the accusations she made against Ruiz in 2011. He also cross-examined P.C-Z on the time it took her to disclose the incident with Ruiz. Ruiz also spent much of his closing argument discussing the credibility of R.C-Z and P.C-Z, drawing the jury's attention to the fact that R.C-Z had recanted in 2011. Because Ruiz put the credibility of the girls at issue and specifically cross-examined them on recantation and delay in reporting the incidents, Arnold's testimony regarding commonality of delayed disclosure and recantation was helpful to the trier of fact.

c.      Arnold's testimony did not amount to profiling evidence

Ruiz argues that Arnold's testimony regarding delayed disclosure and recantation amounted to profile testimony because many of the factors Arnold testified about resembled the family dynamics of P.C-Z and R.C-Z's household. We disagree.

As a general rule, profile testimony that merely identifies a person as a member of a group more likely to commit the charged crime is inadmissible, as it lacks probative value when compared to the danger of its unfair prejudice. *State v. Braham*, 67 Wn. App. 930, 936, 841 P.2d 785 (1992). However, Ruiz acknowledges that Arnold never testified as to the possible reasons for the delayed disclosure or recantation in this particular case. Further, the record shows that Arnold never identified Ruiz as a member of a particular group more likely to commit child

No. 49719-1-II

molestation. Instead, her testimony was limited to describing whether delayed disclosure and recantation were common in child sex abuse cases. She also explained possible reasons why a child might delay in disclosing abuse or later recant. At no point did Arnold reference how the specific living situation of P.C-Z and R.C-Z contributed to P.C-Z's delayed disclosure and R.C-Z's recantation.

Ruiz has failed to show that Arnold's testimony was inadmissible. Therefore, we hold that the trial court did not abuse its discretion in allowing Arnold to testify as an expert on delayed disclosure, child memory, and recantation.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, J.

Maxa, C.J.

19