IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>       v.<br><br>RICHARD BANNISTER,<br><br>               Appellant. | No. 81187-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Richard Bannister appeals his conviction for rape in the second degree. He contends that an emergency room doctor's "diagnosis" that the victim was "sexually assaulted" was an impermissible opinion on guilt. While the testimony was confusing, in context, it is not a manifest constitutional error. We affirm. Because Bannister cannot demonstrate prejudice, his ineffective assistance of counsel claim also fails.

FACTS

Richard Bannister met A.H. when she moved into his senior-living apartment building in September 2017. They became friends, occasionally watching movies together in his apartment. On July 4, 2018, A.H. walked past Bannister's door on her way to a picnic with friends. He invited her in for a drink and she accepted.

According to A.H., after talking for a while, Bannister went into the

Citations and pin cites are based on the Westlaw online version of the cited material.

bathroom and came out without his clothes on. His fists balled up, his face red and sweating he told A.H., "I'm going to fuck you." He grabbed A.H. and threw her onto his bed, ripped off her jeans, and removed her underwear. Bannister held onto her knees and legs and spread them apart and started licking her genital area, putting his tongue in her vagina. A.H. screamed for help repeatedly while asking Bannister to let her go. A.H. then grabbed a lamp, while knocking over a nightstand, and attempted to hit Bannister with the lamp to escape. Bannister grabbed the lamp and A.H. made it off the bed, onto the floor, but then lost control of her bowels and defecated on the floor. She started crawling toward the door, scraping her knees and elbows. Bannister moved on top of her, telling her he would break her jaw if she screamed. He then attempted to push his penis into her vagina. At that point, a person started banging on the door saying they had contacted the police and they were on their way. Bannister then went into the bathroom and threw A.H. a towel and told her to clean herself up, telling her "Don't you go out there and lie on me." He then opened the door, shoved her out, and closed the door. Bannister opened the door again and threw her clothes out.

The two witnesses who saw A.H. in the hallway testified that on their way to the apartment elevator, they heard loud noises and the sounds of furniture falling in Bannister's apartment. They heard a woman screaming, "Somebody please help me. He's hurting me. He's trying to rape me." A.H. then came "flying out" onto the floor in her underwear and a little top. A.H. looked as though she had been fighting. Bannister's door slammed and locked. A.H. was crying and

shaking, telling them, "He's got my stuff. And he's trying to rape me." Bannister's door opened and a pair of pants were thrown in A.H.'s face.

When police arrived, A.H. appeared scared and disheveled, her hair messed up, rug burns on her elbows and knees, and missing clothing and shoes. She told the officers that Bannister had sexually assaulted her.

Police knocked on Bannister's door and he agreed to speak with them. When they entered his apartment they saw a pair of ladies' sandals, a hat, and a purse. They also observed that the apartment had just been cleaned: a bottle of 409 cleaner sat out, and there were wet and slightly brown spots on the floor near the bed. Police conducted a recorded interview with Bannister. Bannister referred to A.H. as his "gal pal." He told officers she was as "cute as a button." "If you don't want to kiss her, you're fucking gay."

Bannister told police that he was asleep when A.H. came into his apartment. They started watching a movie together and A.H. started talking about "gangster shit" so he told her to leave. He claimed that she refused to leave, so he left the room and she eventually left. When officers asked about the wet floor stains, Bannister said they were from food but later in the interview said that A.H. had spilled liquid on the floor. Bannister said he never touched A.H. When asked if he had oral sex with her he said, "No. I wish." Police arrested Bannister.

Bannister presented a different version of events at trial. He claimed A.H. washed her vagina on his washcloth for "several minutes" and then came out of the bathroom with her pants undone. When he told her to leave she "stumbled

3

backwards," hit her shoulder on the lamp, her pants fell down and then she defecated. Bannister said he did not tell the police the truth about the stains because A.H.'s incontinence was a "private matter."

After the event, A.H. went to the hospital. She told the emergency room doctor that she had been sexually assaulted. The doctor documented A.H.'s skinned elbows and knees and bruising on her left shoulder. The doctor did not conduct any sort of sexual exam, leaving that for the sexual assault nurse examiner (SANE). The SANE also noted the scrapes on A.H.'s elbows, knees, and bruise to her shoulder but also noted bruising on A.H.'s left outer thigh and right knee. The SANE took vulvar perineal swabs on the outside of A.H.'s vagina to be tested for evidence. The results indicated the presence of male saliva DNA (deoxyribonucleic acid) matching a reference sample from Bannister. The type of DNA testing performed in this case was "Y-STR," a Y-chromosome testing. The sample matched the DNA profile of Bannister and his male paternal relatives. A forensic scientist testified that such a match would not be expected to "occur more frequently than one in 8600 male individuals in the U.S. population."

Bannister was charged in King County Superior Court with rape in the second degree by forcible compulsion and indecent liberties.

At trial, during the State's direct examination of the emergency room doctor, the prosecutor asked the doctor to review the medical chart created at the time A.H. reported to the hospital, including the notes the emergency room nurse made, and her own notes. The doctor read aloud the notes from the emergency

room nurse:

> Patient presents to ED for a complaint of hip pain and sexual assault that happened today around 1630. Patient tearful when explaining what happened today. Patient states she was at apartment complex in a computer [room] and saw a guy that she's known. Patient states he asked her if she wanted a drink, and she states she went with him. And he came out naked.
>
> Patient states he threw her onto bed and began assaulting her. Patient states she was screaming but was told that if she continued to scream he said he would break my jaw. Patient states she told him, 'Do whatever, just let me go.' She states that he was licking me and that there were a couple of people outside that knocked and heard me scream. Patient stated, 'I don't know if he came inside me.' Patient states PD were on the scene and arrested him.

The doctor also read her own notation that A.H. "presents today after recent sexual assault just prior to arrival. . . . She notes that she has some abrasions on her bilateral elbows and knees but no other injuries." The prosecutor asked, "Based on your examination of how you – how she told you the injuries occurred, in your evaluation of her as a doctor, were they consistent?" The doctor answered, "Yes."

After the doctor explained that she referred A.H. for further forensic evaluation, the prosecutor asked the doctor, "[W]hat was your final diagnosis for [A.H.] as it relates to this incident?" The doctor replied, "Sexual assault of adult, multiple abrasions, contusion of left shoulder." Defense did not object.

During cross-examination, the doctor stated more than once that she does a physical exam but does not perform sexual exams and did not examine A.H.'s genitalia. During re-cross examination of the doctor, defense introduced the word "rape" into the diagnosis.

5

[DEFENSE COUNSEL]: So, [Doctor], I think you concluded your testimony by saying your final diagnosis was adult rape sexual -- was it called sexual rape?

[WITNESS]: That is what I diagnosed at that time.

[DEFENSE COUNSEL]: Okay. And that was basically based on the reported assertions of [A.H.]; is that correct?

[WITNESS]: Yes.

A jury convicted Bannister of rape in the second degree and indecent liberties. At sentencing, the trial court vacated the indecent liberties charge on the basis that it merged with the rape charge. The court imposed a standard range, indeterminate sentence of 95 months to life. Bannister appeals.

DISCUSSION

Opinion Testimony

Bannister argues that the emergency room doctor's testimony that she diagnosed A.H. with "sexual assault" was an impermissible opinion on guilt and such an error was not harmless. Bannister did not object to the doctor's testimony. Generally, appellate courts will not consider issues raised for the first time on appeal. State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).

> Appellate courts are and should be reluctant to conclude that questioning, to which no objection was made at trial, gives rise to "manifest constitutional error" reviewable for the first time on appeal. The failure to object deprives the trial court of an opportunity to prevent or cure the error. The decision not to object may be a sound one on tactical grounds by competent counsel, yet if raised successfully for the first time on appeal, may require a retrial with all the attendant unfortunate consequences. Even worse, and we explicitly are not referring to counsel in this case, it may permit defense counsel to deliberately let error be created in the record, reasoning that while the harm at trial may not be too serious, the error may be very useful on appeal.

City of Seattle v. Heatley, 70 Wn. App. 573, 584-85, 854 P.2d 658 (1993) (quoting State v. Madison, 53 Wn. App. 754, 762-763, 770 P.2d 662 (1989)). As we stated in Heatley,

> the proper approach in analyzing alleged constitutional error raised for the first time on appeal involves four steps. First, the reviewing court must make a cursory determination as to whether the alleged error in fact suggests a constitutional issue. Second, the court must determine whether the alleged error is manifest. Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case. Third, if the court finds the alleged error to be manifest, then the court must address the merits of the constitutional issue. Finally, if the court determines that an error of constitutional import was committed, then, and only then, the court undertakes a harmless error analysis.

Heatley, 70 Wn. App. 573 at 585 (quoting State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992)).

We first conduct a cursory determination as to whether the alleged error in fact suggests a constitutional issue.

Witnesses may not provide their opinion as to the guilt of a defendant. State v. Kirkman, 159 Wn.2d at 927. Although an expert opinion might "embrace an ultimate issue to be decided by a trier of fact," witnesses cannot provide an opinion on a defendant's guilt. State v. Hudson, 150 Wn. App. 646, 652, 208 P.3d 1236 (2009); see also ER 704. Such opinions are improper "whether made directly or by inference." State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014). Witnesses may not express an opinion that the defendant is guilty or express an opinion as to the truth of the accuser's statement to the witness, hence indirectly opining that the defendant is guilty. Madison, 53 Wn. App. at

7

760. Opinion testimony regarding the veracity of witnesses is particularly inappropriate in criminal trials. State v. Montgomery, 163 Wn. 2d 577, 591, 183 P.3d 267 (2008). "Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." Kirkman, 159 Wn.2d at 927.

The jury had to determine if Bannister committed rape in the second degree by forcible compulsion. Any reasonable juror would understand that such a crime is a form of sexual assault. The alleged error does suggest a constitutional issue.

We next examine if the error was manifest.

To show manifest error, a defendant must demonstrate how the alleged constitutional error caused "actual prejudice" at trial. Kirkman, 159 Wn.2d at 926-27. "Actual prejudice" requires a showing that the error had " 'practical and identifiable consequences in the trial of the case.' " Kirkman, 159 Wn.2d at 935 (quoting State v. WWJ Corp., 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)). Just because the error involved the admission of testimony alleged to constitute an opinion on guilt, it does not necessarily mean it is an error of constitutional magnitude that may automatically be raised for the first time on appeal under RAP 2.5(a)(3). Heatley, 70 Wn. App. at 583.

Although the doctor used the term "diagnosis," the record does not support that her statement was an actual "diagnosis." Webster's Third New International Dictionary defines "diagnose" as "to identify (as a disease or

8

condition) by symptoms or distinguishing characteristics." Yow v. Dep't of Health Unlicensed Prac. Program, 147 Wn. App. 807, 819, 199 P.3d 417 (2008) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 622 (1993)). Sexual assault or rape is a description of a crime. The record shows that the doctor's "diagnosis" was nothing more than a reflection of A.H.'s claim that she had been sexually assaulted. The injuries the doctor referred to as being consistent with what A.H. claimed, were the physical injuries such as the abrasions on knees and elbows. The doctor repeatedly stated she did not conduct a sexual examination. The doctor also made clear that she based her diagnosis on the reported assertions of A.H. In context, while the doctor's testimony that she diagnosed A.H. with "sexual assault" may have been arguably improper for lack of foundation, the doctor did not opine that she believed A.H. had been sexually assaulted or raped.

These facts and circumstances are far different than the cases Bannister relies upon, State v. Hudson, 150 Wn. App. 646, 208 P.3d 1236 (2009) and State v. Black, 109 Wn.2d 336, 745 P.2d 12 (1987). Both are distinguishable. First, in both Hudson and Black, defense properly preserved the issue for appeal by objecting to opinion testimony.

In Hudson, defense counsel objected to the State introducing expert opinion that the victim's injuries were caused by "nonconsensual sex." Hudson, 150 Wn. App. at 651. The doctor in the instant case did not testify that the physical injuries she observed were caused by a sexual assault. The doctor said the injuries were consistent with what A.H. claimed occurred.

9

In Black, our Supreme Court rejected an expert's testimony that the victim was suffering from "rape trauma syndrome." Black, 109 Wn.2d at 348. The Supreme Court held that "under the Frye[1] standard, expert testimony on rape trauma syndrome is not a scientifically reliable means of proving lack of consent in a rape case." Black, 109 Wn. 2d at 348-49 (finding prejudice because the term implied an opinion that the alleged victim is telling the truth and was in fact raped). Unlike the expert in Black, the doctor in the instant case did not diagnose A.H. with a condition.

Bannister has not established that the doctor's testimony is a manifest constitutional error that we would consider for the first time on appeal under RAP 2.5(a). See State v. O'Hara, 167 Wn.2d 91, 99, 217 P.3d 756 (2009).

Even if we were to conduct a harmless error analysis, any error would be harmless because the State can establish beyond a reasonable doubt that, despite the alleged error, the jury would have reached the same verdict. See State v. Quaale, 182 Wn.2d 191, 202, 340 P.3d 213 (2014).

The State argues that even if the doctor's diagnosis was inadmissible, the other evidence against Bannister was overwhelming. We agree.

Two neutral witnesses who heard the attack testified. They testified that A.H. screamed from Bannister's apartment, "He's trying to rape me," and they saw her "flying" out of the apartment without her pants. Their statements were consistent with A.H.'s statement of events. The State called multiple police officers to testify who stated that they saw wet brown spots on the carpet,

---

[1] Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923).

congruent with A.H.'s testimony that she lost control of her bowels. The State presented evidence of saliva from A.H.'s genitalia matching Bannister's DNA profile, and injuries she sustained, corroborating A.H.'s narrative of Bannister's attack. Bannister gave contradictory statements at trial and provided no explanation for the third party witness testimony that they heard A.H. scream, "He's trying to rape me."

<u>Ineffective Assistance of Counsel</u>

Bannister next argues that he was denied effective assistance of counsel when his attorney did not object to the doctor's improper opinion testimony and made it worse by introducing the word "rape" into the doctor's diagnosis.

A criminal defendant is entitled to effective legal counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; <u>State v. Grier</u>, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). We review ineffective assistance of counsel claims de novo. <u>State v. Rafay</u>, 168 Wn. App. 734, 775, 285 P.3d 83 (2012).

In order to prevail on an ineffective assistance of counsel claim, a defendant must prove two elements: deficient performance and resulting prejudice. <u>State v. Estes</u>, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). Deficient performance is shown where an attorney's conduct falls "below an objective standard of reasonableness based on consideration of all the circumstances." <u>Estes</u>, 188 Wn.2d at 458 (quoting <u>State v. McFarland</u>, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). Counsel's performance is not deficient where their conduct can be explained as a legitimate trial strategy. <u>Estes</u>, 188 Wn.2d at 458. Prejudice requires a showing that there is a reasonable probability that " 'but for

counsel's deficient performance, the outcome of the proceedings would have been different.' " Estes, 188 Wn.2d at 458 (quoting State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). Where a defendant fails to prove either element, "we need not inquire further." State v. Hassan, 151 Wn. App. 209, 217, 211 P.3d 441 (2009).

For the reasons discussed above, Bannister cannot demonstrate that "but for" his defense counsel's performance the outcome of his trial would have been different. Because Bannister fails to show he was prejudiced, we need not inquire further.

We next turn to Bannister's statement of additional grounds for review.

Speedy Trial

Bannister contends that multiple continuances prevented him from having a speedy trial in violation of the United States and Washington Constitutions and CrR 3.3.

Bannister was arrested on July 4, 2018. He was charged five days later on July 9, 2018. Bannister was incarcerated for 18 months between his arrest and his January 2020 trial. The record is silent as to Bannister's arraignment date, his initial trial date, and multiple continuance hearings, except for October 4, 2019. The record does show that two attorneys withdrew from representing Bannister, one in August 2018 and another in February 2019. On October 4, 2019, over Bannister's objection, the court granted a motion from Bannister's defense counsel continuing Bannister's trial to December 5, 2019 to accommodate an expert witness and defense counsel's vacations. Through a

January 7, 2020 declaration from defense counsel in the record,[2] we know the court previously continued Bannister's trial for various scheduling issues, such as vacation leave of both counsel or unavailability of counsel because of other trial commitments. Trial began on January 6, 2020. According to the declaration, Bannister objected to all the continuances.

*A. CrR 3.3*

A detained defendant must be brought to trial within 60 days of an arraignment. CrR 3.3(b)(1)(i), (c)(1). Courts may continue a defendant's trial date if a continuance is required "in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." CrR 3.3(f)(2). "Continuances appropriately granted by the court are excluded from the calculation of time to trial and extend the allowable trial date to 30 days after the end of the excluded period." State v. Hatt, 11 Wn. App. 2d 113, 150, 452 P.3d 577 (2019) (quoting CrR 3.3(b)(5), (e)(3), (f)). Both the unavailability of witnesses and leaves of attorney are valid grounds for trial continuances. See State v. Nguyen, 68 Wn. App. 906, 914, 847 P.2d 936 (1993) (unavailability of a witness); State v. Heredia-Juarez, 119 Wn. App. 150, 153, 79 P.3d 987 (2003). (leave of prosecutor); State v. Jones, 117 Wn. App. 721, 729, 72 P.3d 1110 (2003) (leave of defense counsel). If a defendant's counsel brings a motion for a trial continuance, any objection from the defendant is waived. CrR 3.3(f)(2). We review violations of CrR 3.3 de novo. Hatt, 11 Wn. App. 2d at 150.

---

[2] The declaration was in support of a CrR 8.3(b) motion to dismiss that was denied.

The record before us is insufficient to evaluate Bannister's claim that his speedy trial rights were violated under CrR 3.3. The record includes only the October 2019 continuance order. As that motion for continuance was brought by Bannister's defense counsel, Bannister's objection to it was waived. CrR 3.3(f)(2). To the extent the record does suggest that at least one continuance was brought on behalf of the State for a prosecutor's leave, there is no evidence that the continuance was improper as a prosecutor's scheduled leave is a proper basis for a court to grant a continuance. Heredia-Juarez, 119 Wn. App. at 153. Because it appears that defense counsel requested several continuances, and the record on appeal does not include any orders granting continuances or setting trial dates other than the October order, we cannot review this claim. RAP 10.10(c).

*B. Constitutional speedy trial right*

Criminal defendants are guaranteed a constitutional right to a speedy trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Washington courts rely on the Barker balancing test to determine whether a defendant has been denied the right to a speedy trial. State v. Ollivier, 178 Wn.2d 813, 827-28, 312 P.3d 1 (2013); Barker v. Wingo, 407 U.S. 514, 530-33, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). A defendant must first show that the delay between their charges and trial was "presumptively prejudicial" to trigger the balancing test. Ollivier, 178 Wn.2d at 827. To determine if the delay was presumptively prejudicial, courts may look to the length of the delay, the complexity of the charges, and the reliance on eyewitness testimony. State v. Iniguez, 167 Wn.2d 273, 292, 217

P.3d 768 (2009).  If a Barker test is triggered, we are required to consider the "[l]ength of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  Hatt, 11 Wn. App. 2d at 153 (citing Barker, 407 U.S. 514 at 530).  We review constitutional violations de novo.  Hatt, 11 Wn. App. 2d at 152.

The charges against Bannister were neither complex nor numerous.  We recently concluded that an 18-month delay was sufficient to trigger a Barker analysis in a first degree murder case that included an array of accompanying charges.  Hatt, 11 Wn. App. 2d at 153.  The delay at issue in Bannister's case was presumptively prejudicial to trigger a Barker analysis.

The first and second factor of the Barker analysis, the length of the delay and reason for the delay, allow the court to assess whether the delay was "reasonably necessary for defense preparation" and "evaluates each party's responsibility for the delay."  Hatt 11 Wn. App. at 154.  In the instant case, Bannister's trial was delayed for presumably about 18 months.  However, for the reasons discussed above, the record is insufficient for us to review each party's responsibility for the delay or whether each continuance was reasonably necessary for defense preparation.  Thus, we cannot review this claim and need not examine the remaining Barker factors.  RAP 10.10(c).

Government Misconduct

In his statement of additional grounds, Bannister next alleges that the government engaged in misconduct by not disclosing relevant evidence to the defense.

15

"The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." CrR 8.3(b). A defendant alleging government misconduct must demonstrate both misconduct and actual prejudice. State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017). A defendant can bring a government misconduct claim where the State violates its discovery obligations. Salgado-Mendoza, 189 Wn.2d at 429. As part of those obligations, the State must turn over all potentially exculpatory evidence, as well as evidence that could be used as impeachment evidence. State v. Mullen, 171 Wn.2d 881, 894, 259 P.3d 158 (2011) (analyzing the State's disclosure obligations to defense under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)). We review a trial court's decision on a motion to dismiss for an abuse of discretion. State v. Brooks, 149 Wn. App. 373, 384, 203 P.3d 397 (2009).

Bannister's allegation echoes motions for dismissal filed by his defense counsel during trial. The first motion, filed January 7, 2020, alleged that the State had not delivered reports from deputies involved with Bannister's allegations. The trial court denied this motion. The second motion to dismiss, filed January 13, 2020, alleged that the State failed to provide Brady material related to the termination of a deputy involved in the Bannister investigation. The court determined the material in question was not Brady material. We review each in turn.

16

*A. Reports from deputies*

On January 6, 2020, the prosecutor sent an e-mail to defense suggesting that it had a report from a deputy that had not previously been provided. This prompted a motion from defense to dismiss. At a hearing where the parties examined what deputy reports were and were not provided, it was discovered that the State actually had provided the report to defense in November 2018, and the only missing materials amounted to "administrative cover sheets." The trial court explained, "in light of the hundreds and hundreds of pages of documents that have been produced, the failure to produce what this Court would regard as relatively inconsequential administrative sheets of paper, does not rise to the level of gross mismanagement which would mandate dismissal of this matter or other sanctions pursuant to Criminal Rule 8.3(b)." At the hearing, defense counsel did not further maintain it did not receive relevant reports. The trial court did not abuse its discretion in denying the defense motion to dismiss.

*B. Brady material*

During trial, the State provided an e-mail chain to defense explaining its efforts to locate one of the investigating officers who took A.H.'s statement. It was through this e-mail chain that defense learned that the deputy had resigned in lieu of termination. Defense moved for dismissal arguing that the State violated its Brady obligations by failing to provide defense with the reason the deputy resigned in lieu of termination. The trial court ordered the State to provide the deputy's personnel file for in camera review so it could determine if the reason for the deputy's departure qualified as Brady material. The State

explained that the deputy's departure had nothing to do with the case or qualified as Brady material. Nevertheless, the State provided the deputy's file under seal for the court's in camera review. The State also located the deputy and alerted the court and opposing counsel that the State could make her available for trial should defense wish to call her.

After reviewing the file, the court denied the motion explaining, "I would likely not even allow any of this information to be introduced for impeachment purposes. It's not even tangentially related to any investigation involved in this case or her abilities with regard to investigations. It's really quite tangential." Defense counsel stated it did not intend to call the deputy to testify based on the court's ruling.

Because Bannister did not designate the sealed record to be transferred on appeal, we do not have a sufficient record to review his claim. RAP 10.10(c).

Prosecutor's Conflict of Interest

In his third statement of additional grounds, Bannister contends that the prosecutor who tried his case had a conflict of interest because she expressed personal feelings about Bannister and "improperly vouched for [his] conviction". Bannister fails to cite to any part of the record to support his claim. The record suggests Bannister is referring to an e-mail that the prosecutor provided to defense that appeared to relay statements A.H. made to the prosecutor about whether she and Bannister were both Jehovah's Witnesses, a fact Bannister

disputes.[3] The issue is not that the prosecutor vouched for Bannister's conviction but that it appeared the prosecutor became a potential impeachment witness in the case.

Generally, an attorney may not act as a witness at a trial in which they are acting as an advocate. RPC 3.7.

Again, Bannister echoes a motion to dismiss raised by his defense counsel below. However, Bannister fails to acknowledge that the information in the e-mail the prosecutor sent were notes she found in her file relaying information a victim advocate received from A.H. This was explained during a hearing in court. The court summarized by saying, "[the prosecutor] didn't receive this information. So all she did is she disclosed it. That's why it's her email. And when I read this, the first thing that jumped out at me was '[A.H.] told us,' and I – the question was: Who's us? Now we know the 'us' is somebody from the victim's advocate office." Thus, the court correctly concluded that it is the victim advocate who is a potential impeachment witness, not the prosecutor. The prosecutor did not have a conflict of interest and the court correctly denied the defense motion. Bannister fails to otherwise establish the existence of any other conflict of interest.

<u>Jury Instructions</u>

Finally, in his statement of additional grounds, Bannister complains of

---

[3] Bannister cites to Appendix E, which appears to refer to attachments to defense counsel's trial memorandum. While Appendix E relates to an order regarding defense expert, Appendix F includes an e-mail from the prosecutor that is the heart of the claim.

flawed jury instructions suggesting that it was unclear whether the indecent liberties charge was a separate act from the rape charge. Because the trial court vacated the indecent liberties conviction at sentencing, Bannister's claim is moot. See State v. Calhoun, 163 Wn. App. 153, 168, 257 P.3d 693 (2011) (assignment of error is moot if there is no remedy available to the defendant). We therefore decline to review this claim.

We affirm.

_____
Coburn, J.

WE CONCUR:

_____                    _____
Chun, J.                                    Mann, C.J.